

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

FILED
IN OPEN COURT

NOV 1 9 2021

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Criminal No. 1:21-cr- 246 |
| v. | Count 1: Conspiracy to Receive Health Care Kickbacks (18 U.S.C. § 371) |
| THOMAS RALEY, JR., | Count 2: Conspiracy to Commit Wire Fraud (18 U.S.C. § 1349) |
| Defendant. | |

## STATEMENT OF FACTS

The United States and the defendant, THOMAS RALEY, JR. ("RALEY"), stipulate that

the allegations in the Criminal Information and the following facts are true and correct. The

United States and RALEY further stipulate that had the matter gone to trial, the United States

would have proven the allegations in the Criminal Information and the following facts beyond a

reasonable doubt.

### General Allegations

1.     RALEY is a physician specializing in orthopedic surgery, spine surgery, and

comprehensive pain management services and who owns a medical practice called Advanced

Spine and Pain ("ASAP"). ASAP has offices in Maryland and in the Eastern District of Virginia.

2.     SETH MYERS is a licensed attorney who has worked in various industries

including factoring, a type of debtor finance where a business sells its accounts receivable to a

third party at a discount.

3.     MICHAEL BEATTY is a licensed pharmacist who owned FALLSTON

PHARMACY, located in Fallston, Maryland, from in and around December 2002 and continuing

to in and around December 2013. In and around December 2013, BEATTY sold FALLSTON

PHARMACY to another pharmacy; however, he continued to work for the pharmacy after the sale. In and around the fall of 2014, the new owner terminated BEATTY from FALLSTON PHARMACY.

4. MOHAMED ABDALLA ("ABDALLA"), is a pharmacist who has been licensed in the Commonwealth of Virginia since in and around May 2008. During the events at issue, ABDALLA owned and operated MEDEX HEALTH PHARMACY ("MEDEX HEALTH") and ROYAL CARE PHARMACY ("ROYAL CARE").

5. In 2008, MYERS helped RALEY and his partner set up two companies — one which was a factoring business and another business that bought medical devices and sold them to hospitals as a third-party biller. The partnership between RALEY and the other doctor was short-lived. RALEY ultimately hired MYERS to work for him full-time.

6. After the partnership between RALEY and the other doctor dissolved, MYERS helped RALEY create another company funded by RALEY's brother, T.R., which was called MEDIPLANT FUNDING ("MEDIPLANT"). MEDIPLANT performed factoring and third-party billing. MYERS also set up and managed a company called MID-AMERICA MEDICAL SUPPLY, LLC for RALEY.

7. RALEY and MYERS also formed a company called Laboratory RX, LLC ("LABRX"). Sometime after LABRX was formed, RALEY and MYERS used it exclusively to market items to other medical practices that had in-office pharmacies. Even though MYERS was listed as the President and sole owner at LABRX, RALEY controlled key parts of the business, including most of the assets. RALEY knew that he could not be listed as the owner of LABRX because, at some point, he intended to send prescriptions to LABRX, and he knew it was improper to send prescriptions to a company he owned. RALEY intended for LABRX to receive

2

commissions from prescriptions that RALEY wrote and directed to certain pharmacies and RALEY did not want it to be known that he was being paid for these actions.

### The Conspiracies to Violate the Anti-Kickback Statute and Commit Wire Fraud

8.      From in and around spring 2013 and continuing through at least early-2016, in the Eastern District of Virginia and elsewhere, RALEY knowingly and willfully did combine, conspire, confederate and agree with MYERS, BEATTY, ABDALLA and others, known and unknown, to commit the following offenses against the United States: (1) violating Title 42, United States Code, Section 1320a-7b(b)(1)(A), by knowingly and willfully soliciting or receiving remuneration in return for referring patients to specific pharmacies for the furnishing, and/or arranging for the furnishing, of items and services for which payment was made, in whole or in part, under a Federal health care program, namely TRICARE, Medicare, and Medicaid; and (2) violating Title 18, United States Code, Section 1343, by knowingly and with the intent to defraud, devising and intending to devise, a scheme and artifice to defraud insurance companies and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, transmitting and causing to be transmitted by means of wire communication in interstate commerce, certain writings, signs, signals, and sounds for the purpose of executing the scheme or artifice.

9.      As described in detail below, RALEY and MYERS entered into agreements with pharmacies to send prescriptions for lucrative compound medications to the pharmacies and agreements with durable medical equipment ("DME") companies to utilize specific companies' DME in surgeries in exchange for payments from these companies, which represented significant percentages of the profits these companies were receiving from federal health benefit programs, i.e., impermissible kickbacks. At all relevant times, RALEY knew that these pharmacies and

DME companies were submitting claims to federal health benefit programs for payment for the prescriptions or the DME, and that paying or receiving kickbacks violated the terms of the agreements these companies had with the federal health benefit programs and/or the prescription benefits managers ("PBMs") that administered the programs on the federal health benefit programs' behalf. At all relevant times, RALEY also knew that this conduct was prohibited by federal law.

### 1. Schemes Involving Compound Prescriptions

10. RALEY and MYERS eventually used LABRX as a vehicle to profit off of compound prescriptions. Compounding a prescription is a practice in which a licensed pharmacist or licensed physician combine mixed or altered ingredients of a drug or multiple drugs to create a drug tailored to the needs of an individual patient where standard medications, approved by the United States Food and Drug Administration ("FDA"), are unsuitable due to patient allergies, intolerance to method of administration, or other uncommon factors. Compounded medications are prescribed and mixed for specific patients with particular needs; they are not to be mixed and marketed in bulk quantities. Compounding includes the combining of two or more FDA approved drugs; however, the compounded drugs are not FDA-approved. That is, the FDA does not verify the safety, potency, effectiveness or manufacturing quality of compounded drugs.

11. Many compounded drugs are far more expensive than drugs approved by the FDA for the treatment of the same physical condition and are commonly reimbursed by federal health care programs and private insurance companies at a far higher rate than FDA-approved drugs.

12. RALEY and MYERS knew at the time that many health insurance programs were paying pharmacies large amounts of money for compounds during different points in the

4

conspiracy and that TRICARE generally paid the most.

13.     TRICARE is a health insurance program of the United States Department of Defense. TRICARE provides civilian health insurance benefits for military personnel, military retirees, reservists, and military dependents all around the world. There are two types of beneficiaries under the TRICARE program: (a) Sponsors — active duty, retired and guard/reserve members; and (b) Family Members — spouses and children who are registered in the Defense Enrollment Eligibility Reporting System ("DEERS").

14.     To pay a claim, TRICARE requires that the item or service being billed must be medically necessary, properly prescribed by a licensed physician, and provided to a TRICARE beneficiary. TRICARE determines what services and items are covered and sets the rates at which covered items or services are reimbursed.

15.     32 CFR Part 199 regulates the TRICARE program. 32 CFR § 199.9(c)(12) defines fraud as, among other things, "[a]rrangements by providers with employees, independent contractors, suppliers, or others which appear to be designed primarily to overcharge the [Civilian Health and Medical Program of the Uniformed Services] through various means (such as commissions, fee-splitting, and kickbacks) used to divert or conceal improper or unnecessary costs or profits." A claim resulting from a violation of 32 CFR § 199.9 is false and TRICARE would not pay for these items or services.

16.     TRICARE is a Federal health care benefit program as defined by Title, 18, United States Code, Section 24(b), and as such it is illegal for an individual to pay kickbacks to a person for the referral of an individual for the furnishing of some health care item, benefit, or service.

17.     TRICARE has contracted with Express Scripts, Inc. ("ESI") as their prescription benefit manager ("PBMs") to administer their prescription drug program. ESI maintains a network

5

of approved pharmacies that TRICARE beneficiaries can use for an in-network copay. Part of ESI's service to TRICARE includes adjudicating claims submitted by pharmacies, and approving or denying payment pursuant to the TRICARE plan terms. In-network pharmacies are required to submit claims electronically. There are occasional exceptions to this, the parameters of which are outlined in the Provider Agreement. Pharmacies typically submit claims from computers housed in their facilities. All retail pharmacies submit claims through a switch company, which route the claims to the correct PBM.

18.     Claims that are submitted electronically by pharmacies to ESI are adjudicated at ESI's datacenter in New Jersey. All of ESI's electronic servers are located in New Jersey. ESI sends a return message electronically to the pharmacy indicating whether the claim is approved or denied, pursuant to the TRICARE plan terms.

19.     Payment occurs when pharmacies submit claims for approval, ESI submits TRICARE Encounter Data ("TED") records to TRICARE for approval, TRICARE approves the TED records for payment, TRICARE funds the ESI accounts, and ESI administers the payments to pharmacies, pharmacy services administrative organizations ("PSAOs"), chains, or, in the case of paper claims, beneficiaries.

20.     Medicare and Virginia Medicaid are federal health care programs funded directly, in whole or in part, by the United States Government, or a state health care program, as defined by Title 42, United States Code, Section 1320a-7b(f). Medicare and Virginia Medicaid, are also federal health care programs as defined by Title 18, United States Code, Section 24(b).

21.     Medicare was established under Title XVIII of the Social Security Act and provides benefits to persons who are 65 years of age or older or disabled.

22.     Medicaid was established under Title XIX of the Social Security Act. All states,

the District of Columbia, and the U.S. territories have Medicaid programs designed to provide health coverage for low-income people. Although the federal government establishes certain parameters for all states to follow, each state administers their Medicaid program differently, resulting in variations in Medicaid coverage across the country.

23.     RALEY initially learned about receiving payments for prescribing compounded pharmaceuticals when he became involved in a company-run study testing the effectiveness of pain creams. RALEY would write prescriptions for a specific pharmacy and later the pharmacy would write a check to ASAP for the prescriptions related to the study. Initially, RALEY was not aware of how much the health benefit programs paid for the prescriptions.

24.     Between 2009 to 2011, individuals in Las Vegas proposed an arrangement for RALEY to send prescriptions for a commission. While compounds are frequently designed to be uniquely tailored to each patient, at least 75% of the time, RALEY would simply check a box for the compound recommended by the pharmacist on a pre-printed prescription pad. This relationship with the Las Vegas pharmacy lasted approximately one year and RALEY received kickbacks totaling approximately 25-30% of the net profit for the compound prescriptions.

### Conspiracy with FALLSTON PHARMACY

25.     In and around late spring or early summer of 2013, RALEY approached BEATTY, the owner of FALLSTON PHARMACY, about an arrangement to receive kickback payments for compound prescription referrals. After initially brokering the kickback deal with BEATTY, RALEY sent MYERS to meet with BEATTY to set up the agreement to send prescriptions to FALLSTON PHARMACY in exchange for commissions. On or about July 9, 2013, RALEY, BEATTY, and MYERS met at a restaurant in Baltimore, Maryland to discuss the arrangement.

7

26.     In order to disguise the bribe and kickback payments, BEATTY and MYERS created a sham business arrangement to promote the appearance that FALLSTON PHARMACY was paying for legitimate services, rather than for the acts of prescribing and referring compounded drug prescriptions.

27.     Specifically, following the meeting at the restaurant, MYERS approached BEATTY with a document titled, Area Manager Agreement (Independent Contractor).  Pursuant to this agreement, MYERS agreed to provide "marketing" services for FALLSTON PHARMACY in exchange for fees. MYERS agreed to "devote such time, energy and skill on a regular and consistent basis as is necessary to solicit orders and promote the sale of Fallston Pharmacy's products." In exchange, BEATTY agreed to provide LABRX, "50% of the sales on all products sold to customers by the Area Manager . . . and 50% on all products sold by his/her subordinate marketing representatives." MYERS and BEATTY executed this agreement in July of 2013.

28.     RALEY and MYERS used FALLSTON PHARMACY because FALLSTON PHARMACY was willing to pay 50 percent of the profits for the referrals. Other doctors at ASAP also sent their compound prescriptions to FALLSTON PHARMACY including, but not limited to, Dr. V.M. and Dr. G.P. These other doctors received "bonuses" for every compound prescription that they wrote that was sent to FALLSTON PHARMACY. RALEY told the doctors that they would receive a commission as part of their bonuses for each compound prescription they wrote.

29.     RALEY understood that the agreement was for the referral of prescriptions and for unlawful kickbacks paid for these prescriptions. While the arrangement was documented as a "marketing agreement," Myers performed little to no marketing. RALEY, MYERS, and BEATTY discussed very little related to marketing plans or proposed marketing ideas. MYERS made clear to BEATTY that the marketing agreement was only for RALEY to refer prescriptions to

8

FALLSTON PHARMACY and that any "marketing fees" or "commissions" were payments to RALEY for sending compound prescriptions to the pharmacy.

30.     To further the arrangement, BEATTY developed potential compounded formulas and investigated whether insurance companies would pay for those formulas. BEATTY told RALEY the compound formulas that received the best reimbursements and the medical conditions for which the compounds could be used. The goal was then for RALEY to prescribe to his patients the compounds that reimbursed at the highest amounts. RALEY was already aware of some of these high-reimbursing compounds from the pain cream study and provided some of these formulas and prescription pads he received from drug company reps to BEATTY.

31.     MYERS coordinated having pre-printed prescription pads made that listed lucrative compound formulas and provided them to RALEY for RALEY to use.

32.     Pursuant to the scheme, patients were not affirmatively given the option to use other pharmacies. The prescriptions were mostly sent to FALLSTON PHARMACY by facsimile and then the pharmacy would contact the patients for insurance information.

33.     In November of 2013, RALEY, MYERS, and BEATTY met at a restaurant located in Baltimore. At this meeting, RALEY and MYERS expressed their frustration that more money should be generated by the arrangement. RALEY AND MYERS also complained about patients not receiving their medications and various issues related to insurance companies not paying for the compound prescriptions. Specifically, RALEY was concerned that a large quantity of prescriptions he sent to the pharmacy were not ultimately being filled.

34.     From December 2013 to February 2014, BEATTY sent at least the following payments to LABRX totaling an approximate amount of $7,370.64 pursuant to the above-

discussed arrangement. MYERS monitored the payments closely and sent BEATTY an email on or around February 18, 2014 noting that MYERS was missing the payment for December of 2013.

| Date | From | To | Amount | Memo Note |
|------|------|-----|--------|-----------|
| 09/23/2013 | M&M Beatty LLC | LABRX | $5075.88 | Compound profit |
| 12/10/2013 | M&M Beatty LLC | LABRX | $555.33 | compound profit – Oct and Nov 2013 |
| 02/18/2014 | M&M Beatty LLC | LABRX | $1739.43 | compound profit – dec 2013 |

### Sale of FALLSTON PHARMACY to Company S.P.

35.    In and around December 2013, BEATTY sold FALLSTON PHARMACY to company S.P., which was owned by S.G.[1] BEATTY, however, remained an employee of the pharmacy and the original agreement between BEATTY, RALEY, and MYERS continued with S.G.

36.    After the sale of the pharmacy to company S.P., MYERS, on behalf of RALEY, continued to regularly communicate with BEATTY to obtain information about which compounded formulas "paid the best" and what price ranges the compounded prescriptions were reimbursed at, so that MYERS could inform RALEY and the other doctors involved in the scheme of the most lucrative prescriptions to prescribe to patients. MYERS, pursuant to RALEY's direction, monitored the kickback payments being sent from the pharmacy, resolved discrepancies, and required monthly compound dispensing reports reflecting detailed information involving the

---

[1] Hereinafter, the Statement of Facts continues to refer to the new pharmacy as FALLSTON PHARMACY, even following the sale of the pharmacy to company S.P., which was operated by S.G.

prescriptions involved in the arrangement. These spreadsheets contained information such as the name of the prescribing doctor, the patient name, the insurance company, the compound type, the insurance payment, the patient co-pay, the total collected, and the net profit.

37.     MYERS continued to try to generate more revenue from the prescriptions, and, for example, on or about February 18, 2014, MYERS sent BEATTY an email noting that for some of RALEY's older TRICARE prescriptions, reimbursements had averaged around $2,500 but that FALLSTON PHARMACY was only averaging approximately $1,300 for these prescriptions. BEATTY responded to this message by stating that they could "shoot for higher reimbursement."

38.     In an email dated March 6, 2014, MYERS directed BEATTY to make sure the checks from FALLSTON PHARMACY were made out to LABRX, instead of MYERS. The checks were ultimately mailed to HANOVER MEDICAL, located in Bel Air, Maryland, for bookkeeping purposes. HANOVER MEDICAL is solely owned by RALEY.

39.     RALEY sent a significant amount of prescriptions to FALLSTON PHARMACY, and in April of 2014, MYERS sent BEATTY an email requesting that LABRX's commission be increased to 60% based on "our increase in scripts sent as well as revenue generated."

40.     RALEY remained directly involved in making sure the business arrangement was as lucrative as possible for the parties involved. For instance, in an email sent on or about January 14, 2014 to MYERS and BEATTY, RALEY informed BEATTY that RALEY wanted to discuss various scar creams and "what they pay and what insurances are paying for it." RALEY was specifically interested in scar creams because at that time health insurance programs paid high reimbursements rates for these products.

41.     Indeed, in January of 2014, RALEY contacted BEATTY by email discussing a solution to the problem that FALLSTON PHARMACY, which was located in Maryland, could

11

not mail prescriptions to RALEY's patients located in Virginia pursuant to Virginia law. Specifically, RALEY proposed, "Now that I have an office in MD can u fill VA scripts if they are mailed to my MD office and I hand deliver them to the [patients] in VA? Most would be TRICARE [patients]." FALLSTON PHARMACY ultimately delivered prescriptions to RALEY'S office so that patients could pick them up at RALEY's Virginia office.

42.     Furthermore, on or around March 26, 2014, RALEY sent BEATTY an email in which RALEY complained that they needed the pharmacy to communicate better with the patients. RALEY stated: "Seth [MYERS] and I can get you busier but the [patient] contact needs to get better."

43.     In April 2014, BEATTY, MYERS, and RALEY met for dinner again in Baltimore, Maryland to discuss issues related to the kickback arrangement. Also present at the meeting were the FALLSTON PHARMACY Manager, N.K., and a technician that worked at the pharmacy, C.G. One purpose of the meeting was that MYERS indicated, pursuant to an email sent on March 28, 2014, that he had "several opportunities [he] was working on that would lead to a large increase [in] scripts and we need to discuss handling this." RALEY and MYERS tried to recruit additional doctors and sales representatives into the scheme to send prescriptions to FALLSTON PHARMACY. The plan was for these individuals to receive commissions and RALEY would receive a portion of the money from the prescriptions written from these other doctors. At one point during this meeting, RALEY expressed his frustration that FALLSTON PHARMACY was not billing as much as RALEY believed it could be. RALEY, MYERS, and BEATTY agreed that FALLSTON PHARMACY needed to find a better way to get the health insurance programs to pay for compounded prescriptions.

12

44.     In addition to the concerns raised at this meeting, another source of frustration for RALEY and MYERS was that S.G. was not paying the amount agreed upon for each prescription and wanted to negotiate a lower percentage to be paid to RALEY and MYERS.

45.     During the kickback arrangement, RALEY asked BEATTY to waive certain patient co-payments at FALLSTON PHARMACY. BEATTY agreed to waive the co-payments since the compounded medications were so expensive, many of the patient co-payments were very high, and patients either could not afford them or would not be willing to pay them. Because the insurance companies paid such high reimbursements for the medications, it was still profitable for the co-conspirators to waive co-payments.

46.     During the time after S.P. purchased FALLSTON PHARMACY, FALLSTON PHARMACY sent the following payments to LABRX for a total approximate amount of $225,462.01. Approximately, $147,891.02 of this amount was for payments made by TRICARE.

| Check Date | From | To | Amount | Memo Note |
|---|---|---|---|---|
| 02/07/2014 | Fallston Pharmacy | Seth Myers | $11,153.64 | Jan-Total |
| 04/01/2014 | Fallston Pharmacy | LABRX | $5,000 | Feb-Comp |
| 04/15/2014 | Fallston Pharmacy | LABRX | $47,054.35 | March compounding commission |
| 05/19/2014 | Fallston Pharmacy | LABRX | $49,050.00 | |
| 05/20/2014 | Fallston Pharmacy | LABRX | $24,595.64 | |
| 05/23/2014 | Fallston Pharmacy | LABRX | $24,595.64 | April 2014 |
| 06/05/2014 | Fallston Pharmacy | LABRX | $21,337.58 | May account payments |
| 06/12/2014 | Fallston Pharmacy | LABRX | $21,337.58 | May account payments |
| 06/18/2014 | Fallston Pharmacy | LABRX | $21,337.58 | May account payments |

47.     In total, TRICARE paid approximately $344,280.62 to FALLSTON PHARMACY for 164 prescriptions included in the kickback scheme. FALLSTON PHARAMCY made a net profit of approximately $295,782.03 from payments made by TRICARE for compound prescriptions that were part of the kickback scheme, after estimated expenses are deducted. As such, LABRX received approximately $147,891.02 as a kickback from these payments made by TRICARE to FALLSTON PHARMACY for the compound prescriptions that were referred.

48.     In total, Medicare paid approximately $9,581.71 to FALLSTON PHARMACY for the prescriptions included in the kickback scheme. FALLSTON PHARAMCY made a net profit of approximately $7,208.50 from payments made by Medicare for compound prescriptions that were part of the kickback scheme, after estimated expenses are deducted. As such, LABRX received approximately $3,604.25 as a kickback from these payments made by Medicare to FALLSTON PHARMACY for the compound prescriptions that were referred.

49.     For the Medicare prescriptions that FALLSTON PHARMACY received pursuant to the kickback scheme, the pharmacy would have collected a total of approximately $308.55 in co-payments from Medicare patients. Pursuant to the arrangement with FALLSTON PHARMACY, LABRX would have been entitled to approximately 50% of those payments.

### *Laboratory Rx of Maryland*

50.     After the sale of FALLSTON PHARMACY, RALEY and MYERS were ultimately not happy with the business relationship with the pharmacy's new owner. RALEY and MYERS discussed opening their own pharmacy, which would be called LABORATORY RX OF MARYLAND. RALEY and MYERS wanted BEATTY to work at this pharmacy as the Pharmacist-In-Charge. The plan was for the doctors in RALEY's primary medical practice, and the other doctors that MYERS and RALEY had recruited, to send their prescriptions to

14

LABORATORY RX OF MARYLAND. LABORATORY RX would receive 90% of the profits and BEATTY would receive 10% of the profits.

51.    On or about May 19, 2014, BEATTY and MYERS, on behalf of LABORATORY RX, entered into an agreement regarding the operation of LABORATORY RX OF MARYLAND and the division of the profits. While MYERS signed the contract, RALEY intended to control and direct the enterprise. RALEY could not be a party to the written contract because in Maryland it is impermissible for a physician to be an owner of a pharmacy. While RALEY did not sign the contract, RALEY significantly participated in discussions about the project, suggested that BEATTY meet with RALEY's brother, who had access to a space where RALEY believed they could establish the pharmacy, and intended that the doctors at his practice would send a large number of prescriptions to the proposed pharmacy. RALEY intended and understood that the majority of the proceeds from this venture would go to RALEY.

52.    Ultimately, an alarm system was installed at the proposed pharmacy location, a contractor, who was a contact of RALEY's, modified the space to make it appropriate for a compounding pharmacy, equipment was purchased, and a bank account was set up. The space was inspected by the Maryland Board of Pharmacy and received the requisite approvals. Nevertheless, LABORATORY RX OF MARYLAND was never opened.

53.    Ultimately, RALEY and MYERS decided to find another pharmacy where RALEY could receive compensation for prescribing compound prescriptions.

### Conspiracy with MEDEX HEALTH PHARMACY

54.    In and around late 2013, a patient introduced RALEY to MOHAMED ABDALLA ("ABDALLA"), the owner of MEDEX HEALTH PHARMACY ("MEDEX"). In addition to MEDEX, ABDALLA operated or controlled other pharmacies including ROYAL CARE

PHARMACY ("ROYAL CARE"), MILLENIUM PHARMACY ("MILLENIUM"), and PHARMACY at GREAT FALLS ("GREAT FALLS"), all located within the Eastern District of Virginia. RALEY told MYERS to approach ABDALLA and determine if ABDALLA would be interested in a similar kickback arrangement to the one that RALEY had with FALLSTON PHARMACY.

55.     On or about May 20, 2014, ABDALLA and MYERS, on behalf of LABRX, entered into a Marketing Agreement that documented the relationship and the negotiated profit split. Specifically, MYERS agreed to provide "marketing" services for MEDEX in exchange for fees. MYERS agreed to "devote such time, energy and skill on a regular and consistent basis as is necessary to solicit orders and promote the sale of MEDEX's products." In exchange, MEDEX agreed to provide LABRX, "80% of the sales on all products sold to customers by the Area Manager . . . and 80% on all products sold by his/her subordinate marketing representatives." There were very little, if any, discussions about actual marketing, and instead the parties understood that the agreement was solely for prescription referrals.

56.     Once the arrangement was finalized, MYERS provided ABDALLA with the pre-printed prescription pad from FALLSTON PHARMACY. ABDALLA began running compound prescriptions through insurance programs and adjusting the prescriptions to reflect the formulas that paid the most money. RALEY and ABDALLA intentionally used ingredients with higher reimbursement rates to make more money and RALEY gave final approval to the pre-printed prescription pads, knowing that the combination of the listed ingredients reimbursed at a higher rate than other equally functional ingredients. RALEY and ABDALLA agreed to waive patient co-payments in certain instances because the co-conspirators were making so much money based on what insurance programs would reimburse for the prescriptions.

16

57. RALEY AND MYERS reviewed compound dispensing reports provided by ABDALLA. These reports tracked the number of prescriptions sent to MEDEX pursuant to the conspiracy. RALEY did not trust ABDALLA to fully adhere to the terms of the agreement so RALEY asked MYERS to try to obtain access to MEDEX's software systems to track the prescriptions. While MYERS signed the agreement, MYERS was working at the direction of RALEY, and RALEY and MYERS understood that the majority of the profits generated from this arrangement would go to RALEY.

58. During the kickback arrangement with ABDALLA, RALEY was seeing more patients and wrote increasingly more compound prescriptions. Prescriptions were also sent to MEDEX from other individuals at ASAP including but not limited to, Dr. V.M., Dr. G.P., and PA R.O. as part of the agreement, along with prescriptions from other doctors.

59. When LABRX began generating significant money from the kickback scheme with FALLSTON PHARMACY, RALEY's accountant suggested that he make RALEY's wife, K.R., a salaried employee of the company. RALEY told MYERS that this was a way for RALEY to get money out of LABRX and he instructed MYERS to give K.R. a salary of $200,000. Since MYERS' salary at this time was $200,000, RALEY increased MYERS' salary to $250,000 when K.R. began taking a salary from LABRX. In late 2014-early 2015, RALEY's accountant also suggested that he use LABRX to pay for K.R.'s lease of a Mercedes SUV. RALEY then instructed MYERS to use LABRX to pay for K.R.'s lease. In September 2015, LABRX wrote a check to RALEY in the amount of $280,000, which purported to be a loan (but was never repaid) so that RALEY could purchase a building in Baltimore, Maryland. This space was turned into apartments, which RALEY expected to be profitable. Money from LABRX was also used to pay tuition at the private school attended by RALEY's children.

60.     At some point in the conspiracy, ABDALLA informed RALEY and MYERS that the health insurance programs were no longer paying as much money for compound medications, but the co-conspirators continued the arrangement, profiting on the amounts the insurance programs did pay. Eventually, ABDALLA attempted to renegotiate the arrangement so that he would receive 40% percent of the profits instead of 20%. RALEY rejected the proposal and the relationship between ABDALLA and RALEY started to deteriorate.

61.     Around the same time, RALEY learned from several patients that the patients' prescriptions, which had originally been sent to MEDEX, were filled at other pharmacies. In February of 2016, RALEY sent MYERS an email noting that ABDALLA was sending patients to MILLENIUM and directed MYERS to find out who owned the pharmacy. RALEY and MYERS learned that ABDALLA sent the prescriptions to other entities owned by ABDALLA to avoid paying LABRX pursuant to the co-conspirators' agreement. Eventually, MYERS filed a lawsuit for money he and RALEY believed that ABDALLA owed under the Marketing Agreement. RALEY and MYERS ultimately stopped referring prescriptions to ABDALLA.

62.     During the time of the conspiracy with ABDALLA, MEDEX sent at least the following payments to LABRX for a total of approximately $2,573,323.45.

| Check Number/Wire Ref# | Check Date | From | To | Amount |
|---|---|---|---|---|
| 1053 | 07/18/2014 | Medex Health LCC | Laboratory RX | $135,200.00 |
| 1055 | 07/23/2014 | Medex Health LCC | Laboratory RX | $55,315.30 |
| 1076 | 08/22/2014 | Medex Health LCC | Laboratory RX | $288,720.00 |
| 1112 | 09/25/2014 | Medex Health LCC | Laboratory RX | $213,375.90 |
| 1145 | 10/24/2014 | Medex Health LCC | Laboratory RX | $259,894.82 |

| Check Number/Wire Ref# | Check Date | From | To | Amount |
|---|---|---|---|---|
| 1192 | 11/28/2014 | Medex Health LCC | Laboratory RX | $157,863.23 |
| 1244 | 01/05/2015 | Medex Health LCC | Laboratory RX | $127,634.71 |
| 1266 | 01/26/2015 | Medex Health LCC | Laboratory RX | $205,343.92 |
| 1301 | 02/25/2015 | Medex Health LCC | Laboratory RX | $165,980.82 |
| 1318 | 03/25/2015 | Medex Health LCC | Laboratory RX | $194,900.00 |
| 1320 | 03/25/2015 | Medex Health LCC | Laboratory RX | $2,039.85 |
| 1359 | 04/26/2015 | Medex Health LCC | Laboratory RX | $191,274.84 |
| 1392 | 05/26/2015 | Medex Health LCC | Laboratory RX | $206,380.77 |
| 1400 | 06/03/2015 | Medex Health LCC | Laboratory RX | $3,997.80 |
| 1424 | 07/08/2015 | Medex Health LCC | Laboratory RX | $71,069.76 |
| 1442 | 07/08/2015 | Medex Health LCC | Laboratory RX | $18,424.60 |
| 1490 | 08/17/2015 | Medex Health LCC | Laboratory RX | $22,147.73 |
| 1546 | 09/22/2015 | Medex Health LCC | Laboratory RX | $35,251.21 |
| 1577 | 10/21/2015 | Medex Health LCC | Laboratory RX | $23,153.75 |
| 1032 | 11/17/2015 | Medex Health LCC | Laboratory RX | $70,337.42 |
| 1049 | 12/22/2015 | Medex Health LCC | Laboratory RX | $14,890.84 |
| 1050 | 12/22/2015 | Medex Health LCC | Laboratory RX | $110,126.18 |

63.     TRICARE paid $2,335,332.62 to MEDEX, which reflects reimbursement for 796 prescriptions, and $2,152,978.12 to ROYAL CARE, another pharmacy owned by ABDALLA, for the compound prescriptions included in the kickback scheme. RALEY agrees that $747,047.45 of the amount paid by TRICARE to Royal Care prior to December 22, 2015 and $245,103.06 of the

19

amount paid by TRICARE to Royal Care after December 22, 2015 was foreseeable to him as part of the kickback scheme. This reflects compensation to Royal Care for 436 prescriptions, which was foreseeable to RALEY as part of the kickback scheme.

64. During the conspiracy, Medicare paid a total of approximately $117,515.19 to MEDEX, while Virginia Medicaid paid MEDEX approximately $39,638.61. ROYAL CARE was paid a total of approximately $4,295.20 by Medicare during the period of the conspiracy. As such, Medicare paid the entities a total of approximately $121,810.39 pursuant to the scheme.

65. The co-conspirators made a net profit of $2,208,602.12 from the prescriptions submitted to TRICARE from MEDEX and ROYAL CARE made a net profit of approximately $953,054.92 from payments made by TRICARE. RALEY agrees that all of MEDEX's net profits were reasonably foreseeable to him. RALEY further agrees that $409,813.62 of Royal Care's net profits were reasonably foreseeable to him.

66. The co-conspirators made a net profit of $81,013.59 from the prescriptions submitted to Medicare from MEDEX and made a net profit of $4,295.20 from the prescriptions submitted to Medicare from ROYAL CARE. The co-conspirators made a net profit of $37,065.81 for the prescriptions submitted to Medicaid from MEDEX.

### Total Loss to TRICARE, Medicare, and Medicaid

67. RALEY agrees that it was reasonably foreseeable to him that as part of this conspiracy TRICARE paid $3,671,763.75 from submitted claims for reimbursement, which reflects the foreseeable TRICARE payments made to FALLSTON PHARMACY, MEDEX, and ROYAL CARE. RALEY further agrees that it was reasonably foreseeable to him that Medicare and Medicaid paid a combined total of $166,735.51 from submitted claims for reimbursement, which reflects the foreseeable combined Medicare and Medicaid payments made to FALLSTON PHARMACY, MEDEX, and ROYAL CARE.

**Total Net Profit Generated by the Kickback Scheme**

68.    In total, RALEY agrees that the it was reasonably foreseeable to him that the conspiracy generated a net profit of approximately $2,914,197.77 from payments made by TRICARE for compound prescriptions to FALLSTON PHARMACY, MEDEX, and ROYAL CARE.    Pursuant to the arrangement with ABDALLA, LABRX received approximately $1,962,236.14 of this total net profit.

69.    For the Medicare prescriptions MEDEX received pursuant to the kickback scheme, the pharmacy made a net profit of approximately $81,013.59, and ROYAL CARE made a net profit of approximately $4,295.20.    For the Virginia Medicaid prescriptions MEDEX received pursuant to the kickback scheme, the pharmacy made a net profit of approximately $37,065.81. As such, the co-conspirators received a total net profit of approximately $85,308.79 from Medicare payments and $37,065.81 from Virginia Medicaid for a grand total of approximately $122,374.60.. Pursuant to the arrangement with ABDALLA, LABRX received approximately $97,899.68 of this total net profit.

70.    During the conspiracy, LABRX received approximately $2,110,127.16 from the profits paid by TRICARE and $101,503.93 from the profits paid by Medicare, which reflects payments made to FALLSTON PHARMACY, MEDEX, AND ROYAL CARE.

**Patient Co-Payments**

71.    For the TRICARE prescriptions that MEDEX received pursuant to the kickback scheme, the pharmacy received a total of approximately $11,725.91 in co-payments from TRICARE patients and ROYAL CARE received approximately $10,928.00 in co-payments from TRICARE patients.    Pursuant to the arrangement with MEDEX, LABRX received approximately $18,123.13 of these co-payments that TRICARE patients paid.

21

72.     During the period of conspiracy, MEDEX purportedly received a total of approximately $19,689.97 in co-payments from Medicare beneficiaries and $15.00 from Virginia Medicaid beneficiaries.  ROYAL CARE purportedly received approximately $878.29 in co-payments from Medicare beneficiaries.  Pursuant to the arrangement with MEDEX, LABRX received approximately $16,466.60 of these co-payments.

73.     Ultimately, the health insurance programs stopped reimbursing for compound medications and RALEY stopped writing a significant number of compound prescriptions.

### 2. Conduct Involving Durable Medical Equipment ("DME")

74.     RALEY and MYERS were also involved in a Physician Owned Distributorship ("POD") that RALEY was a member of called Pinnacle Spine, LLC. PODs operate as either stocking distributorships or non-stocking distributorships.  PODs derive revenue from, among other things, purchasing, selling, or arranging for the sale of, implantable medical devices ordered by their physician-owners for use in procedures the physician-owners perform on patients at hospitals or surgical centers. Some of the other members of the Pinnacle Spine POD included T.R., Dr. J.A., Dr. R.D, and Dr. P.L.

75.     The purpose of Pinnacle Spine was to purchase spine implants from manufacturers at a discounted price and then sell the implants to hospitals at a lower price than what many other vendors were charging. Pinnacle Spine would purchase medical devices from MID-AMERICA MEDICAL and then re-sell the devices to hospitals. As a result, RALEY profited from the transactions twice. RALEY did not disclose his involvement in MID-AMERICA MEDICAL to the doctors in the POD because RALEY suspected the doctors in the POD would not do business with MID-AMERICA MEDICAL if they knew about RALEY's control over the company.

22

76.     At some point during the relationship between the POD and the DME manufacturers, hospitals no longer purchased the products through entities like PODs and instead started purchasing the DME directly from the manufacturers. When this change occurred, after the DME manufacturers received payment from the hospitals for products used during the surgeries, the DME manufacturers would then still pay the POD or another of RALEY's business entities a commission for using their products in the doctors' surgeries. Some of the payments that the POD and other entities received from the DME manufacturers were used to pay cover representatives, who were individuals who kept track of inventory, submitted bills to the hospitals, and who the POD or RALEY worked with in the operating room during the surgeries involving the medical devices at issue. These cover representatives had knowledge about the components of the DME. The payments that the POD and other RALEY entities received from the DME manufacturers, however, covered more than the cover representative's work and the POD's operating expenses, and were often as much as 60% of the profit received. According to RALEY, the POD and some of his other entities specifically used certain DME manufacturers because they were splitting the profits.

77.     For instance, RALEY had an agreement with DME DISTRIBUTOR 1, which sells products from medical device manufacturers. DME DISTRIBUTOR 1 paid LABRX to use its products for procedures that RALEY performed at a hospital. The payment arrangement with DME DISTRIBUTOR 1 excluded the POD and the POD did not receive any of the profits. During the period in question, LABRX received payments in the amount of $185,791.10 from DME DISTRIBUTOR 1. MEDIPLANT received payments in the amount of $75,085.12. Approximately 35% of these payments would have been for patients enrolled in TRICARE or Medicare. As such, $91,306.68 of this money was for TRICARE or Medicare patients.

**End of MYERS' Work With RALEY**

78.    In and around the summer of 2016, RALEY contacted MYERS and informed MYERS that their business arrangement was no longer working. At about this time, MYERS stopped working with RALEY.

79.    In conclusion, RALEY agrees that it was reasonably foreseeable to him that TRICARE, which is a federal health care program paid at least a total of $3,717,417.08 for the compound medications and DME. RALEY also agrees that it was reasonably foreseeable to him that Medicare paid approximately $172,750.23 and Virginia Medicaid paid approximately $39,638.61 for the compound medications and DME.

80.    Finally, LABRX profited $2,302,937.77 from the conduct involving the compound prescriptions and DME.

81.    The parties agree that for criminal restitution purposes TRICARE is owed $423,572.81, Medicare is owed $15,276.97, and Virginia Medicaid is owed $5,153.02, for a total of $444,002.80.

**Conclusion**

82.    The acts described above were done willfully and knowingly and with specific intent to violate the law, and not by accident, mistake, inadvertence, or other reason.

83.    This Statement of Facts does not contain each and every fact known to RALEY and to the United States concerning RALEY's and his co-conspirators' conduct, including RALEY'S, MYERS', BEATTY's, and ABDALLA's involvement in the charges set forth in the plea agreement.

84.    This Statement of Facts shall be admissible as a knowing and voluntary confession in any proceeding against RALEY regardless of whether the plea agreement is presented to or

accepted by the Court. Moreover, RALEY waives any rights that he may have under Fed. R. Crim.

P. 11(f), Fed. R. Evid. 401, the United States Constitution, and any federal statute or rule in

objecting to the admissibility of the Statement of Facts in any such proceeding.

Respectfully submitted,

Raj Parekh
Acting United States Attorney

Carina Cuellar.
_____

Monika Moore
Carina A. Cuellar
Assistant United States Attorneys

25

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, THOMAS RALEY, JR., and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

THOMAS RALEY, JR.

I am Nina J. Ginsberg, the defendant's attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

Nina J. Ginsberg, Esq.
Attorney for THOMAS RALEY, JR.