IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | Case No. 1:21-cr-246 |
| v. ) | |
| ) | The Hon. Claude M. Hilton |
| THOMAS RALEY, JR., ) | |
| ) | Sentencing Date: October 7, 2022 |
| Defendant. ) | |

**POSITION OF THE UNITED STATES
<u>WITH RESPECT TO SENTENCING</u>**

The defendant, Thomas Raley, Jr., comes before the Court for sentencing after pleading guilty to two counts charging him with (1) conspiracy to offer and pay health care kickbacks, and (2) conspiracy to commit wire fraud. The United States has reviewed the Presentence Report and will address below certain corrections that it recommends to the guideline range. Ultimately, we submit that a guideline range of 78 to 97 months is applicable in this case. For the reasons stated herein, the United States respectfully submits that a sentence of 48 months of incarceration is reasonable and avoids unwarranted sentencing disparities.[1]

Further, the United States agrees that the defendant has assisted authorities in the prosecution of his own misconduct by timely notifying the United States of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the Court to allocate their resources efficiently. This one-level decrease has already been taken into account by the Probation Office in its guideline calculations and is reflected in paragraph 123 of the Presentence Report.

---

1 The United States anticipates filing an under seal pleading early next week. In this pleading, the United States will modify its sentencing recommendation.

I.        Factual and Procedural Background[2]

Beginning in and around 2017, multiple federal agencies began investigating an extensive health care fraud conspiracy operating in the Eastern District of Virginia, Maryland, and elsewhere. During this investigation, federal investigators identified that the defendant, other physicians, and Mohamed Abdalla,[3] who operated several pharmacies in the Eastern District of Virginia, perpetrated a significant fraud against TRICARE, Medicare, Medicaid, and other private health care benefit programs.

The core of the fraud stemmed from illegal kickback agreements Abdalla entered into first with the defendant and then separately with other physicians. Pursuant to these agreements, the physicians agreed to write prescriptions for certain medications, including expensive compound creams, for Abdalla's pharmacies to then fill for the patients. In return, Abdalla provided the defendant and other physicians with a share of the profit from the prescriptions. The defendant entered his illegal kickback relationship with Abdalla in and around 2013; however, this was not his first such illegal arrangement.

A.        The Defendant's Background and Introduction to Kickback Arrangements

The defendant is a physician who specialized in orthopedic surgery, spine surgery, and comprehensive pain management services. For a number of years, he owned his own medical practice, Advanced Spine and Pain ("ASAP"), which had offices in the Eastern District of Virginia and Maryland. During this period, he treated countless patients who carried TRICARE, Medicare,

---

[2] The Statement of Facts signed by the defendant (ECF No. 7) sets forth in extensive detail the facts in this case and the defendant's conduct. As such, this section will provide a high-level review of the conspiracy and the defendant's role in the conspiracy.
[3] Abdalla was sentenced to serve 48 months of incarceration. Case No. 1:20-cr-250.

and Medicaid as their health care benefit programs.

As both a physician and business owner, the defendant was more entrepreneurial than perhaps the average physician. As an entrepreneur, the defendant, with the help of Seth Myers,[4] who was a licensed attorney, set up several companies devoted to factoring, third-party billing, and the purchasing and selling of medical devices. Ultimately, these businesses did not prove to be a sustainable source of income.

Then, the defendant, with Myers' assistance, formed Laboratory RX, LLC ("LABRX"). LABRX exclusively marketed items to other medical practices that had in-office pharmacies. Even though Myers was listed as the President and sole owner of LABRX, the defendant controlled key parts of the business, including most of the assets. The defendant knew that he could not be listed as the owner of LABRX because, at some point, he intended to send prescriptions to LABRX, and he knew it was improper to send prescriptions to a company he owned. The defendant also intended for LABRX to receive commissions from prescriptions that he wrote and directed to certain pharmacies; thus, he did not want it to be known that he was being paid for these actions.

Ultimately, the defendant — driven by his desire to make more money — did enter into illegal agreements with pharmacies to send prescriptions for lucrative compound medications to the pharmacies and with durable medical equipment ("DME") companies to utilize specific companies' DME in surgeries in exchange for payments from these companies. In both cases, the pharmacies and DME companies' payments to the defendant represented a significant percentage of the profits the pharmacies and companies received from federal health benefit programs. The defendant knew that these kickback agreements were illegal and violated the trust placed in him

---

[4] Seth Myers was sentenced to serve 24 months of incarceration. Case No. 1:20-cr-235.

as a physician.

Eventually, the defendant used LABRX as a vehicle to profit from compound prescriptions. Compounding a prescription is a practice in which a licensed pharmacist or licensed physician combine mixed or altered ingredients of a drug or multiple drugs to create a drug tailored to the needs of an individual patient where standard medications, approved by the United States Food and Drug Administration ("FDA"), are unsuitable due to patient allergies, intolerance to method of administration, or other uncommon factors. Many compounded drugs are far more expensive than drugs approved by the FDA for the treatment of the same physical condition and are commonly reimbursed by federal health care benefit programs and private insurance companies at a far higher rate than FDA-approved drugs.

Further, the defendant — like countless other physicians who have since been prosecuted — knew at the time that many health care benefit programs were paying pharmacies large amounts of money for compounds. He also knew that TRICARE – a health insurance program devoted to military personnel, military retirees, reservists, and military dependents all around the world, was one of the health care benefit programs that paid large amounts of money. Finally, he further knew that he violated the law when he entered into a kickback relationship for prescriptions that would ultimately be paid for by TRICARE and other federal health care benefit programs, such as Medicare and Medicaid. Despite knowing this, he chose to enter into the illegal agreements because he wanted to make even more money.

  B. <u>Illegal Kickback Relationship with Fallston Pharmacy</u>

From late spring or early summer of 2013 to in or around fall of 2014, the defendant and Myers entered into their first significant illegal kickback relationship. More specifically, the

defendant and Myers engaged in a scheme with Michael Beatty ("Beatty"), a licensed pharmacist, to receive kickbacks for referring compound prescriptions to Fallston Pharmacy ("Fallston").[5] The conspirators worked to disguise this fraudulent business arrangement by entering into a sham contract for "marketing services" and agreed that the pharmacy would receive 50% of the proceeds from the compound prescriptions that the defendant, his affiliates, or other doctors recruited by the conspirators directed to the pharmacy.

As part of the conspiracy, the defendant used pre-printed prescription pads that listed lucrative compound formulas. The defendant also directed Myers to determine which formulas "paid the best" and monitored the kickback payments being sent from the pharmacy through monthly compound dispensing reports that he required the pharmacy to send. The goal of the conspirators was for the defendant to diagnose his patients with conditions for which the insurance companies would reimburse these high-cost medications. The conspirators knew that alternative medications were available at a lower cost to treat these conditions. The defendant and his co-conspirators specifically targeted TRICARE because TRICARE was paying high reimbursements for the ingredients in the compounded medications and only required beneficiaries to pay minimal co-payments for these compounds. As such, beneficiaries were less likely to complain about the co-payments or refuse to accept the medications. In total, LABRX received approximately $147,891.02 for prescriptions that were part of the kickback scheme.

    C.    <u>Illegal Kickback Relationship with Abdalla</u>

Ultimately, the defendant was dissatisfied with his illegal kickback relationship with Fallston because he was not making a large enough profit. The defendant was very much interested

---

5 Beatty was sentenced to serve 12 months and 1 day. Case No. 1:20-cr-209.

in pursuing a more lucrative relationship with another pharmacy. To this end, in and around late 2013, the defendant directed Myers to approach Mohamed Abdalla, the owner and operator of Medex Health Pharmacy ("Medex"), Royal Care Pharmacy ("Royal Care"), and other pharmacies throughout Northern Virginia. Abdalla agreed to meet with the defendant. During this meeting, the defendant proposed a kickback relationship in which the defendant would be paid 80% of the profits arising from the compound prescriptions sent to Abdalla's pharmacies. Abdalla agreed.

After the defendant and Abdalla came to an agreement, the defendant directed Myers, on behalf of LABRX, to enter into a sham marketing agreement with Abdalla to hide the true purpose of the payment arrangement. Like the arrangement with Beatty, the defendant directed Myers to work with Abdalla to determine the compound formulas that would result in the most reimbursement. Further, the defendant demanded that Abdalla provide monthly compound dispensing reports so that the defendant could track the number of prescriptions sent to Medex. The defendant considered this critical to him ensuring that he received the agreed upon 80% of the profits.

At some point during the conspiracy, Abdalla informed the defendant and Myers that the health insurance programs were no longer paying as much money for compound medications; however, the conspirators continued their arrangement. As the conspiracy continued, Abdalla wanted a greater share of the profits generated and attempted to renegotiate the arrangement so that he would receive 40% of the profits instead of 20%. The defendant rejected this proposal and the business relationship with Abdalla deteriorated. Ultimately, in and around late December 2015, the business relationship between the defendant and Abdalla ended and Abdalla ceased providing the defendant a share of the profits. Despite this, Abdalla continued to submit refill prescriptions

in the defendant's name and pocketed the profit.

After the end of the defendant's highly profitable kickback agreement with Abdalla, the defendant contacted Myers to inform him that their business relationship was no longer working. Shortly thereafter, Myers stopped working for the defendant. During the period of the conspiracy with Beatty and Abdalla, the defendant paid Myers a salary of between $200,000-$250,000 per year.

D. The Defendant's Total Profit

The defendant's conspiracies with Fallston and then Abdalla's pharmacies resulted in him receiving a substantial profit and significant harm to TRICARE, Medicare, and Medicaid. In total, LABRX received approximately $2,110,127.16 from the profits paid by TRICARE and $101,503.93 from the profits paid by Medicare, which reflects payments made to Fallston and Abdalla's pharmacies.

The defendant and Myers' separate conspiracy concerning durable medical equipment also contributed slightly more to the defendant's ill-gotten gains. Thus, in total, the defendant's company, LABRX, received approximately $2,302,937.77 from the illegal kickback arrangements concerning prescriptions and durable medical equipment. These profits primarily came at TRICARE's expense and resulted in substantial harm to a federal health care benefit program devoted to military members, veterans, and their families.

Unquestionably, the defendant was driven by greed when he entered these illegal arrangements. Indeed, when LABRX began generating significant money from the kickback scheme with Fallston, the defendant's accountant suggested that he make his wife a salaried employee of the company. Further, the defendant informed Myers that this was a way for him to

get money out of LABRX and he instructed Myers to provide his wife a salary of $200,000. Later, in late 2014 to early 2015, the defendant's accountant also suggested that he use LABRX to pay for his wife's lease of a Mercedes SUV. In response, the defendant instructed Myers to use LABRX to pay for his wife's lease. Then, in September 2015, LABRX wrote a check to the defendant in the amount of $280,000, which purported to be a loan (but was never repaid) so that the defendant could purchase a building in Baltimore, Maryland. This space was turned into apartments, which the defendant expected to be profitable. Money from LABRX was also used to pay tuition at his children's private school.

E.     Procedural History

On November 19, 2021, the defendant made his initial appearance in this District when he pleaded guilty to the instant charges. The defendant's sentencing has been postponed on several occasions so that he could have time to gather the necessary funds to pay his civil liability under the False Claims Act and attempt to sell his medical practice. The defendant has now paid in full the civil liability that he agreed to in a separate agreement with the Affirmative Civil Enforcement Section of the U.S. Attorney's Office.

II.     Guidelines Calculation

As this Court is well aware, although the Guidelines are advisory, sentencing courts "must consult those Guidelines and take them into account when sentencing." *United States v. Booker*, 543 U.S. 220, 264 (2005). Thus, at sentencing a court "must first calculate the Guidelines range." *Nelson v. United States*, 555 U.S. 350, 351 (2009).

Here, the Probation Office has grouped the two offenses together and has used Count 2 to calculate the offense level, since it results in the higher level. The Probation Office has calculated

the defendant's total offense level at 32. This includes a base offense level of 7, an 18-level enhancement based on a total loss of more than $3,500,000 but $9,500,000 or less, a 2-level enhancement based on a conviction of a health care offense involving more than a $1,000,000 loss to a federal health care program, a 2-level enhancement based on the use of sophisticated means, a 2-level enhancement for abuse of trust, and a 4-level enhancement for role in the offense. It also includes a 3-level reduction for the defendant's acceptance of responsibility and timely notification to the United States of his intention to plead guilty. The guidelines range for this total offense level is 121-151 months.

In the Plea Agreement, the Government has agreed to recommend a loss amount in this case that is more than $3,500,000 but less than $9,500,000. In addition, in negotiating this deal, it was the intention of the parties that the Government would not recommend an additional +2 enhancement based on a loss to federal health care program of more than $1,000,000. Moreover, the Government has agreed to recommend a +2 enhancement based on the defendant's role in the offense, instead of the +4 enhancement recommended by the Probation Office. The Government intends to be bound by the terms of this Plea Agreement and the intent of the parties during the plea negotiations. As such, the Government recommends a base offense level of 7, an 18-level enhancement based on a total loss of more than $3,500,000 but is $9,500,000 or less, a 2-level enhancement based on the use of sophisticated means, a 2-level enhancement for abuse of trust, and a 2-level enhancement based on role in the offense. The Government's recommendation includes a 3-level reduction for the defendant's acceptance of responsibility and timely notification to the United States of his intention to plead guilty. Thus, the Government recommends a total offense level of 28. The guidelines range for this total offense level is 78 to 97 months.

We anticipate that the defendant will object to both the sophisticated means and abuse of trust enhancements. However, the Court has already ruled that both enhancements are appropriate for this conspiracy. Indeed, the court determined that Abdalla and the only other physician to plead guilty thus far, Dr. Leonard Rosen, both abused their position of trust.[6] Further, the Court also determined that the sophisticated means applied in Abdalla's case. So too here.

First, as noted by the Probation Office, the defendant abused his position of trust. Application Note 1 of USSG § 3B1.3 defines "public or private trust" as "a position of public or private trust characterized by professional or managerial discretion" and "[p]ersons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature." Further, for this adjustment to apply, "the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense…" As a physician, the defendant occupied the highest position of trust in our health care system. Unquestionably, federal health benefit programs rely on physicians to prescribe medications for appropriate reasons and not because they are being compensated by prescription. These programs do not have the resources to investigate and verify that providers are complying with all applicable laws and rules. Here the defendant took advantage of his position and in the process harmed federal health benefit programs and profited substantially from his criminal activity.

Second, and as further noted by the Probation Office, there can be no doubt that this conspiracy involved sophisticated means and that the defendant intentionally engaged in or caused Myers to engage in conduct that constituted sophisticated means. As outlined in Application Note

---

6 Leonard Rosen was sentenced to serve a period of two years of probation. Case No. 1:21-cr-205.

9(b) of USSG § 2B1.1, sophisticated means includes "[c]onduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts…" Here the defendant caused Myers to create a company, LABRX, which was used to shield his involvement in illegal kickback arrangements. Further, the defendant and Myers used sham marketing agreements with Fallston and Abdalla to hide the true purpose of the payment arrangement. The defendant then used LABRX to distribute proceeds to his family, which further concealed his own involvement in the conspiracy.

III.    Analysis of Sentencing Factors

In addition to the properly calculated guideline range, this Court is also required to consider the sentencing factors identified in 18 U.S.C. § 3353(a). For the reasons stated below, those factors weigh in favor of imposing a sentence of 48 months of incarceration.

    A.    The Defendant Committed a Serious Offense that Resulted in Harm to Society

First, the defendant committed a serious offense that harmed federal health benefit programs devoted to military members and their families, the retired, and the poor. In doing so, the defendant, who was already a wealthy man, chose greed over the public.

The defendant was the main driver of this fraud. It was he that sought a kickback relationship first with Fallston and then with Abdalla. And it was he that demanded monthly compound dispensing reports so that he could audit the pharmacies to ensure he was receiving his share of the profits. And his share was very important to him because he ultimately refused to renegotiate his 80% share of the profit with Abdalla. Further, the defendant profited considerably from this conduct and used those profits to pay his wife, lease a Mercedes, purchase a rental property, and pay his children's tuition. While there is no doubt Myers and Abdalla are culpable

11

for their conduct, it was the defendant who sought out this lucrative relationship and directed Myers to execute his will. It was also he and his family that benefited substantially from the fraud.

Moreover, the defendant directed considerable steps be taken to hide his fraudulent conduct. First, he used LABRX to shield his involvement in the kickback arrangements and ensured that his name was not associated with the founding documents. Next, he directed Myers to draft the sham contracts for "marketing services" in the hope that law enforcement would not be able to determine that he had entered into illegal kickback relationships with both Fallston and Abdalla. He also used LABRX to distribute proceeds to his family members and himself.

B. The Defendant's Sentence Must Deter Others

Second, this case strongly implicates the need to impose a sentence that will deter other physicians. The National Heath Care Anti-Fraud Association estimates conservatively that health care fraud costs the nation about $68 billion annually — about 3 percent of the nation's $2.26 trillion in health care spending. The Federal Bureau of Investigation estimates that losses could be as high as 10 percent of annual health care expenditure, or $300 billion. *See* About Fraud, Waste, and Abuse as Related to Health Care, U.S. Department of Veteran Affairs (Sept. 30, 2022, 4:11 PM),https://www.va.gov/COMMUNITYCARE/about_us/POI/poi_fwa.asp#:~:text= The%20National%20Health%20Care%20Anti,per%20year%20or%20%24300%20billion. Moreover, the Department of Justice has brought countless prosecutions in the past decade against physicians who violated their oaths and entered similar illegal kickback arrangements. Indeed, in July 2022, the Department of Justice charged 36 defendants across the nation for their role in entering illegal kickback schemes resulting in an estimated $1.2 billion in fraud. There can be no doubt that health care fraud is an urgent national issue that calls for sentences that will deter others

who violate their positions of trust.

Moreover, general deterrence is important in any white-collar case, but is particularly important here because health care fraud crimes like the defendant's are difficult to detect. Health insurance benefit programs rely on physicians to prescribe medications for appropriate reasons and not because they are being compensated by prescription. These programs do not have the resources to investigate and verify that providers are complying with all applicable laws and rules. The jobs of these health care benefit programs become even harder when individuals, like the co-conspirators here, engage in conduct to hide their conduct. Moreover, health care fraud does not just harm the health care benefit programs — it harms the beneficiaries because higher health care costs increase the amounts that these individuals have to pay over time for needed medications and services. While there is no evidence in this case that any patient harm occurred, the financial ramifications of this conduct were pervasive. A term of imprisonment of 48 months is thus necessary to send a message to other potential fraudulent actors that crimes like this one that result in significant financial harm will be met with an appropriate term of incarceration.

      C.      <u>The Need to Avoid Unwarranted Sentencing Disparities</u>

The Court has sentenced a number of individuals in this case. The defendant is most similarly situated to Abdalla because he was a leader, violated a position of public trust, and substantially profited from his misconduct.

On October 13, 2020, this Court sentenced Abdalla, whose guideline range was 70 to 97 months of confinement, to 48 months of confinement. This sentence reflected that Abdalla was a pharmacist engaged in considerable fraud, including fraud unconnected to the defendant. It also reflected that Abdalla was in a position of trust and managed at least two other individuals.

Normally, we believe that the defendant should receive a higher sentence than Abdalla because, as a physician, he held the highest position of trust in the medical profession. Further, he too engaged in fraud with others unconnected to Abdalla, and he was the one that recruited Abdalla to commit this fraud. However, the defendant has taken a substantial step that Abdalla has not yet taken, which is the defendant has paid approximately $3 million in a civil settlement with the United States. As such, we believe a sentence of 48 months is appropriate in this case.

IV.  Conclusion

In light of the seriousness of the defendant's misconduct, the need to deter other physicians, and the need to avoid unwarranted sentencing disparities, a sentence of 48 months of imprisonment is appropriate. Such a sentence would account for the nature of the defendant's crime and deter other physicians from defrauding health benefit programs.

Respectfully submitted,

Jessica D. Aber
United States Attorney

By:      /s/
Carina A. Cuellar
Assistant United States Attorney
Eastern District of Virginia
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone:  (703) 299-3700
Fax:    (703) 299-3980
E-mail:  carina.cuellar@usdoj.gov

**CERTIFICATE OF SERVICE**

  I hereby certify that on September 30, 2022, I filed the foregoing with the Clerk of Court using the CM/ECF system, which will send an electronic copy to the following address:

 Nina J. Ginsberg, Esq.
 1101 King Street, Suite 610
 Alexandria, VA 22314-2956
 Phone: (703) 684-4333
 Email: nginsberg@dimuro.com

  In addition, I hereby certify that on September 30, 2022, I emailed a copy of the foregoing to the following address:

 Kelly M. Smihal
 United States Probation Officer
 401 Courthouse Square, 3rd Floor
 Alexandria, Virginia 22314
 Phone: (703) 299-2304
 Email: Kelly_Smihal@vaep.uscourts.gov

            /s/
            Carina A. Cuellar
            Assistant United States Attorney