IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> v. <br><br> THOMAS RALEY, JR., <br>               *Defendant*. | Case No. 1:21-cr-00246 <br><br> Hon. Claude M. Hilton |

## DEFENDANT'S POSITION ON SENTENCING

Dr. Raley is a highly respected orthopedic spine surgeon and pain management physician who has dedicated his career to treating patients suffering from acute and chronic back pain. For more than twenty years, he has owned his own medical practice, working 10-to-12 hour days, and making himself available to patients on his personal cell phone, at night and during family vacations. For the last twenty years, he has also volunteered his service, sharing his knowledge and expertise freely with health care professionals throughout the medical community. His patients' medical conditions and treatment records are contained in hundreds of thousands of pages of electronic medical records which document the quality of care he has provided to his patients and his personal commitment to their well-being.

Dr. Raley is also a dedicated father, son, and husband who a professional colleague and friend described as "the physician and surgeon" and "the person, father, colleague, and friend … I hope my children would emulate." Letter of David B. Lumsden, M.D., M.S., M.A. (Exhibit 4).

Dr. Raley quickly and fully accepted responsibility, cooperated with the government's investigation of his own conduct and with multiple investigations into the ongoing conduct of others. Dr. Raley has also paid the government extraordinary "restitution" of over $3.1 million

1

to settle his restitution, forfeiture and False Claims Act liabilities, an amount far in excess of the gain he received, or any amount paid by his co-conspirators with whom he is jointly and severally liable.  At the same time, he has spoken openly of his remorse and self-reflection to patients, colleagues, and family members who have written over 50 letters on his behalf.  Dr. Raley respectfully requests this Court impose a sentence that adequately accounts for the serious nature of his crimes but that also reflects the *actual* harm caused by his conduct.

The government has recommended a below guideline sentence of 48 months, the same sentence this Court imposed on Mohamed Abdalla.  The government has also informed the Court that it anticipates filing an under-seal pleading modifying its sentencing recommendation.  In the only related case involving a doctor, the government recommended a sentence of 20 months but deferred to the Court on whether any additional departure was warranted based on the defendant's age, medical condition, and family situation.  The Court sentenced Leonard Rosen to a term of two years' probation with a special condition of six months home confinement with work release to seek employment and other needs.  The Court further ordered the Dr. Rosen to pay $1,468,658.99 in restitution, more than three times the agreed upon restitution in Dr. Raley's case.[1]  For the reasons set forth below, Dr. Raley submits that a sentence of probation with a period of home confinement and a substantial period of community service is sufficient but not greater than necessary to achieve the goals of sentencing in this case.

## I.    FACTUAL BACKGROUND/NATURE OF THE OFFENSE

The nature and circumstances of the offense are largely laid out in the statement facts. Between 2013 and early 2016, Dr. Raley received illegal kickbacks from two compounding pharmacies, Fallston Pharmacy and MEDEX Health Pharmacy, that paid him large portions of

---

[1] *United States v. Leonard Rosen*, No. 1:21-cr-00205, Dkt. 27.

their Tricare and Medicare reimbursements for his prescriptions for compounded pain medications. Dr. Raley knew that the pharmacies were submitting claims to federal health benefit programs for payment for his prescriptions, and that receiving kickbacks violated federal law and the health care program provider agreements he signed, but not that his conduct was a crime.

Unlike Dr. Rosen and the pharmacy defendants, Dr. Raley was not convicted of prescribing medications that were not medically necessary, of writing prescriptions without having established a doctor-patient relationship or conducting appropriate medical examinations, or with billing for products or services that were not provided. Rather, Dr. Raley wrote prescriptions for patients suffering from disabling pain, many of whom he'd treated for years, and for whom the compounded pain medications showed therapeutic benefit. The pain creams served as an effective and far safer form of treatment than highly addictive opioids and allowed Dr. Raley to reduce opioid dependence in many of his patients. Dr. Raley also illegally profited from the prescriptions he wrote.

The higher priced compounded medications were widely promoted as a safer cto addictive opioids that were destroying lives and entire communities. While many compounded drugs were far more expensive than drugs approved by the FDA for the treatment of the same physical conditions and were commonly reimbursed at far higher rates, those far higher rates were set by the same government and private health benefit programs that paid the claims. In many cases, the reimbursement rates set by Tricare and Medicare for the individual ingredients used in the compounded pain creams significantly exceeded the cost of those ingredients. During the criminal investigation, no federal authority ever suggested that Tricare and Medicare

would not have reimbursed the pharmacies for most of the higher priced compounded drugs if kickbacks had not been solicited or paid.

During the course of plea negotiations, the parties agreed that $444,002.80 of the roughly $3.9 million that Tricare and Medicare paid to Fallston and Abdalla's pharmacies constituted actual losses suffered by those programs.

Dr. Raley learned about the use of compounded pain creams as an effective alternative to highly addictive opioid medications in 2012 through his participation in a clinical pain study. He later learned that private and government health benefit programs set reimbursement rates for the compounded pain creams as high as $13,000 for a month's supply and were paying compounding pharmacies for prescriptions using the high-paying formulas instead of the customary practice of reimbursing only the cost of the lowest-price equivalent drug.

The $3,929,805.92 paid by the heath benefit programs for the compound medication and DME, and not the actual loss amount of $444,002.80 is the amount that was used by the Probation Officer to calculate Dr. Raley's advisory guideline range. The government has recommended a below-guideline sentence of 48 months.

Pursuant to the terms of the Plea Agreement, if Dr. Raley reached a settlement with the government of his civil liability under the False Claims Act, the civil settlement payment would be applied first toward the satisfaction of his criminal restitution obligation of $444,002.80, and then toward satisfaction of his criminal forfeiture obligation. On April 6, 2022, Dr. Raley entered into a civil Settlement Agreement with the United States Attorney's Office, the Office of the Inspector General for the Department of Human Services, the United States Department of Defense, the Virginia Department of Medical Assistance Services, and the Virginia Attorney General's Office in the amount of $3 million. On July 29, 2022, the parties signed a Supplement

4

to the Settlement Agreement requiring an additional payment of $159,378.61 and resolving all of Dr. Raley's civil liabilities. The civil settlement which Dr. Raley has fully paid, amounted to an additional financial penalty of $1,250,577.92 that no other defendant in this or any related case has been required to pay.

**The Relative Nature of Dr. Raley's Involvement in the Conspiracy**

Although Dr. Raley played a leadership role with respect to certain aspects of the conspiracy, the government has overstated his responsibility as its "main driver." Indeed, it is evident from Myers' and Abdalla's plea documents and the government's sentencing positions in both cases that Myers and Abdalla readily entered into the illegal arrangements, largely acted without input from Dr. Raley and profited handsomely from the kickback scheme.

To a great extent, Dr. Raley left it to Myers to both negotiate and monitor the illegal kickback payments. In connection with his own guilty plea, Myers admitted that he conceived of and created the business structures for Dr. Raley's companies, often without seeking Dr. Raley's input. Although seen by the government as less culpable (possibly because of his status as an early cooperator), Myers admitted that he negotiated and drafted profit-sharing agreements, and set up the sham "marketing" arrangements with the pharmacies without input from Dr. Raley. Myers also admitted that he personally negotiated with the pharmacists on Dr. Raley's behalf regarding which compounded formulas paid the highest reimbursement rates and monitored the kickback payments for Dr. Raley.

As the nominal owner of LABRX, Myers exercised also considerable control over LABRX's assets. He paid himself over $800,000, approximately one-third of the net profit generated from payments the pharmacies made to LABRX for the prescriptions, often without Dr. Raley's knowledge. The amount of gain for which Dr. Raley was ultimately held criminally

accountable and required to forfeit was reduced by the amount of compensation and the value of the financial benefits that personally Myers received.[2]

Abdalla pled guilty to recruiting participants and engaging in a massive scheme to defraud health care benefit programs spanning half a decade and resulting in massive losses in which Dr. Raley only played a small part.  The total loss amount for which Abdalla was held criminally responsible under the Federal Sentencing Guidelines was $19,681.933.80, five times the $3.9 million loss amount attributed to Dr. Raley.  In his Plea Agreement, the government agreed to recommend a 2-level enhancement for Abdalla's role in the offense, instead of the 4 levels recommended by the Probation Officer.

Throughout the existence of the kickback scheme, Abdalla concealed his ownership of Royal Care Pharmacy and at least one additional pharmacy from Dr. Raley and hid the fact that he was filling Dr. Raley's prescriptions at Royal Care to avoid paying him commissions. Beginning in or around January 2016, Abdalla began submitting fraudulent claims for prescriptions filled at Royal Care Pharmacy using the names of Dr. Raley's patients for prescriptions that Dr. Raley did not write or authorize.  The total loss attributable to Dr. Raley was reduced by the amount that the parties agreed represented claims Abdalla submitted for fraudulent prescriptions that Dr. Raley did not write or authorize.

Abdalla also concealed from Dr. Raley his far more lucrative and extensive kickback arrangements for referrals for compound prescriptions and other medications to other doctors, fraudulently billing for fake prescriptions in the names of friends, colleagues, and family members, billing for prescriptions that were not medically necessary, not prescribed or

---

[2] Dr. Raley provided the government with proof of Myers' total compensation and benefits after Meyers was sentenced which is why Myers was not required to forfeit an amount equal to his $800,000 gain.

authorized by a medical practitioner, or not provided to the beneficiary, engaging in a kickback scheme to fraudulently bill private insurers, fraudulent billing for embassy employees, improper elevation of his employees' credentials to fill prescriptions, paying kickbacks to pharmaceutical representatives in exchange for referring doctors who would direct prescriptions for Naloxone to be filled at Royal Care, and the fraudulent use of manufacturer coupons.[3]   Abdalla was required to pay restitution for actual losses to his victims in the amount of $7,920,796.77, roughly 18 times Dr. Raley's restitution amount of $444,002.80.

**The Guidelines Calculation**

The Probation Office calculated Dr. Raley's total offense level at 32, based on a base offense level of 7, an 18-level increase for loss of more than $3,500,000 but less than $9,500,000, a 2-level increase based on a conviction of a health care offense involving more than a $1,000,000 loss to a federal health care program, a 2-level increase because the offense involved sophisticated means or use of a special skill, a 2-level increase for abuse of trust or use of a special skill, and a 4-level adjustment for his role as an organizer or leader, resulting in an advisory Guidelines range of 121 to 151 months.  Dr. Raley's objections to the Probation Officer's guideline calculation are generally summarized at pages 38 through 42 of the Presentence Report.

In the Plea Agreement, the government agreed to recommend a loss amount of more than $3,500,000 but less than $9,500,000, increased by 2 levels, but not the 4 levels assigned by the Probation Officer based on Dr. Raley's role in the offense.  The parties also agreed to reserve argument on the application of a 2-level enhancement for sophisticated means but did not agree

---

[3] *United States v. Abdalla*, No. 1:20-cr-250 (E,D.Va).

on any further sentencing issues.  Plea Agreement, ¶ 4, Dkt. pp. 4-5.  The government has previously informed the Court that it intends to be bound by the terms of the Plea Agreement and the intent of the parties during plea negotiations.  Consistent with that agreement, the government has also argued that both the sophisticated means and abuse of trust enhancements apply and has recommended a total offense level of 28 with a corresponding guideline range of 78 to 97 months.  Government's Position on Sentencing, Dkt. 16, p. 9.

As anticipated, Dr. Raley disagrees that application of either enhancement is warranted and further submits that the loss amount significantly overstates the seriousness of his offense.

As the government noted, the Court has already ruled that the abuse of trust enhancement was appropriately applied to Abdalla and Dr. Rosen, the only other physician to plead guilty thus far, and has determined that the sophisticated means enhancement was also appropriately applied to the facts in Abdalla's case.  The factors justifying application of those enhancements simply do not exist in this case.

First, Dr. Rosen pled guilty to conspiring with Abdalla to commit health care fraud and to prescribing medications that were not medically necessary.[4]  As a result of Dr. Rosen's kickback arrangement with Abdalla, the health care programs paid $2,212,442.00 for compounded prescriptions prescribed by Rosen and Nurse Practitioner 1 for which Dr. Rosen did not assess the medical necessity and only 15% of which were medically necessary.[5]  The kickback arrangement resulted in health care programs paying $1,880,575.70 to Abdalla's pharmacies for compounded creams that were not medically necessary.[6]

---

[4] *United States v. Leonard Rosen*, 1:21-cr-205.

[5] *Id*., SOF, Dkt. 7, p.5.

[6]  *Id*.

Dr. Rosen also instructed Nurse Practitioner 1 to sign blank pages of the prescription pad provided by a Royal Care Pharmacy employee and signed letters he did not write or read that were sent to a pharmacy benefit manager confirming that his practice wrote prescriptions for metabolic capsule compounds containing red Alaskan algae powder without knowing what the compounds were used for.[7]

Dr. Rosen clearly abused his position of trust as a physician as did Abdalla who in his role as a pharmacist engaged in multiple schemes to defraud involving patient care by fraudulent billing of patient prescriptions that were not medically necessary, not prescribed or authorized by a medical practitioner and/or not provided to the beneficiary, the earmark of an abuse of trust. No patient was harmed by Dr. Raley's conduct, or their trust in him abused.

For there to be an abuse of trust, "[t]here must be a trust relationship between [the defendant] and his victim." *United States v. Agyekum*, 846 F.3d 744, 753 (4th Cir. 2017) (quoting *United States v. Caplinger*, 339 F.3d 226, 236 (4th Cir. 2003). Application of the enhancement "requires more than a mere showing that the victim had confidence in the defendant" and "something more akin to a fiduciary function" as opposed to the commercial relationships inherent in the arms-length transactions between doctors and the health care programs with whom they contract to provide medical services. See *United States v. Brunson*, 54 F.3d 673, 678 (10th Cir.1995). As a physician, Dr. Raley did not occupy a position of trust akin to a fiduciary function with the health care programs. While they may have confidence in physicians not to benefit financially from the medications they prescribe, application of the enhancement requires more.

---

[7] *Id.*, SOF, Dkt. 7, pp. 4, 6.

Second, for an offense to involve sophisticated means, the defendant must intentionally engage in or cause the conduct constituting sophisticated means.

> " 'Sophisticated means' means especially complex or especially intricate offense conduct, pertaining to the execution or concealment of an offense.... Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means." U.S.S.G. § 2B1.1 cmt. n. 9(B) . . .   The enhancement applies where the entirety of a scheme constitutes sophisticated means, even if every individual action is not sophisticated. See *United States v. Jinwright*, 683 F.3d 471, 486 (4th Cir.2012) (applying sophisticated means enhancement under U.S.S.G. § 2T1.1(b)(2) to tax fraud). Even so, sophistication requires more than the concealment or complexities inherent in fraud. *Id.* Thus, fraud per se is inadequate for demonstrating the complexity required for enhancement under U.S.S.G. § 2B1.1(b)(10)(C).

*United States v. Adepoju*, 756 F.3d 250, 257 (4th Cir. 2014)

The Court's ruling on the enhancement in Abdalla's case does not support application of the enhancement here.  Abdalla and his co-conspirators were involved in at least seven separate fraudulent schemes that defrauded federal, state and private health care benefit programs of over $19,000,000 and caused actual losses of $7,920,796.78, justifying application of the sophisticated means enhancement.  Abdalla and his pharmacy co-conspirators also devised schemes to conceal their fraudulent conduct through hard to detect tactics such as creating false invoices and prescriptions intended to fool program benefit managers that the pharmacies were not engaged in what the government described as "systemic and rampant fraud."[8]

On the other hand, the government did not argue that Dr. Rosen's improper billing as an out-of-network provider for in-network patients or the setting up of a separate entity to bill for out-of-network services was sufficient evidence of concealment to justify imposition of an enhancement for sophisticated means. Nor did the Court impose the enhancement.

---

[8] *United States v. Mohamed Abdalla*, No. 1:20-cr-00250, Dkt. 15, p. 8.

Moreover, the government did not argue that the sophisticated means enhancement was appropriate in Myers' case even though Myers admitted that he played a hands-on role in managing the day-to-day aspects of Dr. Raley's kickback relationships and that he conceived of and created the business structures for Dr. Raley's companies – often without seeking Dr. Raley's input. As previously noted, Myers also admitted that he negotiated and drafted profit-sharing agreements, set up the sham "marketing" arrangements with the pharmacies without input from Dr. Raley, and personally negotiated with the pharmacists on Dr. Raley's behalf regarding which compounded formulas paid the highest reimbursement rates and monitored the kickback payments for Dr. Raley. The Court did not apply sophisticated means in Myers's case.

Although Dr. Raley used LABRX to distribute proceeds to himself and his family, he left a money trail from LABRX to himself that was plain and obvious, he declared his total profit as income, and paid taxes on his entire gain. In order to avoid unwarranted disparities, the Court should not apply sophisticated means here.

**The Loss Guideline Overstates the Seriousness of Dr. Raley's Offense**

The Probation Officer calculated a base offense level of 7, increased by an 18-level enhancement for a total loss of more than $3,500,000 but less than $9,500,000. The parties agreed that the total loss for guideline purposes is $3,929,803.82.

In determining the amount of the loss for guideline purposes, USSG §2B1.1, cmt. n.3(F)(viii) provides:

> In a case in which the defendant is convicted of a federal health care offense involving a government health care program, the aggregate dollar amount of fraudulent bills submitted to the government health care programs involving a federal health care program constitutes prima facia evidence of the amount of the intended loss, i.e., is evidence sufficient to establish the amount of the intended loss, if not rebutted.

Under the guidelines, "intended loss" means the pecuniary harm that the defendant purposely sought to inflict.  USSG §2B1.1, cmt. n.3(A)(ii) (emphasis added).

All federal health care claims on which kickbacks are paid are considered "fraudulent bills" under federal law whether they cause an actual loss or are intended by the defendant to cause pecuniary harm.  The parties agreed that Tricare, Medicare, and Virginia Medicaid suffered actual losses of $444,002.80 as a result of Dr. Raley's offense conduct and are entitled to restitution in that amount.  Apart from claims for which restitution was owed, the government has not identified any fraudulent bills that the health care programs would not have otherwise paid had a kickback not been solicited or received, or any other pecuniary harm that Dr. Raley caused or intended.

If the actual loss amount had been used to calculate the guideline range, the loss amount and therefore the offense level would have been increased by 12 instead of by 18.  While the parties have agreed to apply a guideline range of 78 to 97 months, the use of intended loss in calculating the offense level substantially overstates the seriousness of Dr. Raley's offense conduct by at least 6 levels because it ascribes a significantly larger loss than Dr. Raley intended or actually did inflict, or that the health care programs would not have otherwise paid.

## II.    ANALYSIS OF THE SENTENCING FACTORS

In crafting an appropriate sentence, Congress has directed that federal courts "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing based on the statutory factors laid out in 18 U.S.C. § 3553(a).[9]   Indeed, the United States

---

[9] Those factors include: (a) the nature and circumstances of the offense and the history and characteristics of the defendant, (b) the kinds of sentences available, (c) the guideline range, (d) the need to avoid unwarranted sentencing disparities, (e) the need for restitution, and (f) the need for the sentence to reflect the following: the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense, to afford adequate deterrence, to protect the

Supreme Court has held that sentencing courts are required to "consider what sentence is appropriate for the individual defendant in light of the [§ 3553(a)] sentencing factors," *Nelson v. United States*, 555 U.S. 350, 351 (2009) (emphasis added), to ensure that the punishment imposed in a particular case "fit the offender and not merely the crime[.]" *Williams v. New York*, 337 U.S. 241, 247 (1949); see also *Spears v. United States*, 555 U.S. 261 (2009) (explaining that the Sentencing Guidelines cannot be used as a substitute for a court's independent determination of a just sentence based upon consideration of the statutory sentencing factors).

**Personal History and Characteristics of the Defendant**

Dr. Raley's personal history and characteristics support a sentence well below the agreed upon guideline range and the 48-month sentence recommended by the government. Dr. Raley's lifetime of devotion to family, dedication to patients and service to the medical community all warrant a sentence of home confinement and community service.

### *Dr. Raley's Personal History*

Dr. Raley is one of four children. He was raised by a single mother and his maternal grandparents. His mother divorced his father when Dr. Raley was still at very young age because of an abusive relationship and his father's use of corporal punishment. After the divorce, Dr. Raley's mother was forced to rely on public assistance. Dr. Raley started working at the age of twelve and worked through high school, college, and medical school to help pay for his and his siblings' education. According to Kelly Raley Wright, Dr. Raley's oldest sibling:

> "we had a very tough upbringing, raised by a single mother who worked 3 jobs to adequately provided for us. Being close in age, we were both relied on tremendously to aid in the raising of our younger siblings. We worked extremely hard and dedicated our entire childhood to make sure all of us grew up to become

---

public from further crimes of the defendant and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. See 18 U.S.C. § 3553(a).

very responsible and ethical adults . . . These values we created for one another
were deep-rooted, formed through Catholic values and carried into the family and
work values we have today."

Letter of Kelley Raley Wright, Exhibit 1.

Ms. Wright went on to write:

"Dr. Raley also helps to support our father financially, and he cares for the health
of my mother and step-father.  [He] was also there for my maternal grandparents
throughout their lives, caring for them until the day they passed.  They were like
parents to us and the love and support he provided them was incredibly giving."

*Id.*; see also Letters of Kimberly Raley and Thomas J. Raley, Sr., Exhibit 1.

Dr. Raley is also a large contributor to the Catholic Church, Catholic charities, and the

Special Olympics.  He also supports a retired Catholic priest who had nowhere to go when his

church closed by providing him with free housing.  *Id.*  He recently purchased a wheelchair for

one of his patients who could not afford one and offered the patient and her mother a place to

live in one of his buildings when they were homeless.

Dr. Raley's wife and children describe him as an "amazing father."  His daughter

Alexandra writes:

"My father has always pushed my brother and I to do the best we can in school
and all of our activities.  He has taught us to be honest with ourselves and others.
Without his honesty, integrity, and caring personality, my brother and I would not
be able to have the opportunities that we have today."

Her letter is signed, Alexandra Raley, my father's "Sunshine," Exhibit 1.  Similar

sentiments are expressed in letters from all of Dr. Raley's family members.  See Letters,

Exhibit 1

### Dr. Raley's Professional History

For more than twenty years, Dr. Raley has been a highly respected spine surgeon and

pain management doctor.  He is board certified in Orthopaedics and Spine Surgery and has

specialized training in Minimally Invasive Spine Surgery that has allowed the majority of his

patients to have cervical, thoracic, and lumbar procedures on an outpatient basis. Dr. Raley regularly lectured nationally and internationally and traveled across the United States and internationally to teach other physicians state-of-the-art surgical techniques and perform surgery on unserved populations in China and South America. His research appears in leading medical journals, and he has authored chapters in many surgical textbooks. He also is a peer reviewer for an internationally recognized spine journal and was active in the design and implementation of many new surgical procedures and surgical implants. See CV, Exhibit 2.

Dr. Raley maintained active licenses to practice medicine in five states that he will voluntarily surrender. From January 2009 until August 1, 2022, he was the owner, attending physician, and medical director of Advanced Spine and Pain, LLC (ASAP). He refused to take any time off during the more than three years that his case has been pending until he stopped seeing patients on August 1, 2022, also the date he sold his medical practice and urgent care clinics in distressed asset purchase sales. He has been unemployed since August 1, 2022.

Despite his personal circumstances, Dr. Raley continued to be present for his patients. Over 40 letters from Dr. Raley's former patients, professional colleagues, and former employees describe a doctor who is overly generous with his time, who "exudes trust," and who exhibits "care and love for his patients". Many of his patients with whom he has established close personal relationships have written that he saved their lives or saved them from a lifetime of pain. For example:

Mansrour Barzani, the current Prime Minister of the Kurdistan Regional Government, first received treatment from Dr. Raley in 2011 when, as Chancellor of the Kurdistan Region Security Counsel, he was charged with safeguarding Kurdistan from serious ongoing threats to

15

its peace and stability.  According to Mr. Barzani, Dr. Raley's treatment significantly improved

his pain and has allowed him to avoid back surgery.  Mr. Barzani writes:

> "Over the years, I have come to know him not just as a physician, but as a family
> friend.  Not only has he treated me, but he also has generously given much of his
> time and used his medical expertise to treat many of my family members,
> including my immediate family members.  Tom has treated all of us (as well as
> other members of our Kurdistani community) like his own family.  He has gone
> out of his way to visit patients at their homes (no matter how far away), when
> they're unable to reach his office.  Two years ago, at the height of the pandemic, I
> asked if Tom would come to Kurdistan to treat me and my family members
> because we were unable to travel abroad.  Tom, without hesitating, agreed, and
> embarked on the long journey to Kurdistan…During his 2 days in Kurdistan, Tom
> took the time to train one of our local neurosurgeons on how to administer spinal
> injections, which was significant because these minimally invasive injections can
> help prevent (costly) spinal surgery."

Letter from Masrour Barzani, Exhibit 3.

> A patient who considers Dr. Raley a friend as well as his patient writes:

> "I have been a patent of Dr. Raley since June 14, 2014 seeing him at least once a
> month if not more.  He has operated successfully on me at least four times and
> applied a multitude of back and hip injections along the way.  In the beginning of
> our doctor/patient relationship he prescribed a compound pain cream medication
> that was without question the best medication of that kind I had ever used.  In
> fact, it helped eliminate the need of further opioid usage as well as injections and I
> was devastated after approximately 2 years when my new insurance company
> advised me they did not cover the cream."

Letter from Detective Lt. John Paradise, Homeland Security Section, Baltimore Police

Department, Exhibit 3.

> Dr. Raley's patient of eight years writes:

> "if it were not for the correct and direct prognosis, and professional care provided
> by Dr. Raley, my career in law enforcement would have ended a long time ago . .
> . Dr. Raley operates his offices on the level of a perfectionist, and demands that
> his staff from the receptionist at the front desk, to the nurses provide the same
> level of care.  His patient's health is [] paramount."

Letter of Jacqueline Green, Religious Services Coordinator, Henrico Sheriff's

Department, Exhibit 3.

16

Another patient writes:

"Dr. Raley has gone out of his way on evenings or weekends to follow up with me for any emergency surgical event I have faced. On one occasion last spring, a 101-year old woman literally fell on me and broke my shoulder in four places. I knew Dr. Raley was on vacation yet when the attending physician called Dr. Raley, he immediately followed up with me and checked on me throughout the week until he could see me."

Letter of Mary Elizabeth Foley, Exhibit 3.

A 71 year-old patient from Fairfax who was treated with pain creams writes:

"He saved my world by helping me be active again . . . the whole time, he treated me without addictive opioids, and thank heavens he suggested the compound cream that allowed movement without pain. Nothing else (except heat and ice) took away this pain. The cream allowed movement. Once I went on Medicare, this compound drug was not available to me without great cost, and it was a huge loss for pain management . . . I was always thankful that Dr. Raley worked so hard to alleviate pain without addictive drugs. He listened. He gave options and looked at long term effects of decisions. He is the only Orthopod who ever treated me in the present and future. He helped me make it through today while planning for tomorrow. He is an amazing, caring, talented clinician."

Letter of Angeline Long, Exhibit 3.

As a final example, another patient with a history of 20 surgeries and a wife who had a

pain pump put in by Dr. Raley writes:

"Shortly after having the pain pump put in, Susan fell on a sidewalk outside a doctor's office building and landed on the side of her body where the pain pump was installed. Over the next day of two, her incision where the pain pump was installed … started to open up. We both noticed the pump mechanism was starting to come out of her belly. I called Dr. Raley's office and sent a picture to Dr. Raley through his patient portal showing the pump half way out of her body. Most if not all doctors would have told us to go to the nearest Emergency Room and have someplace else deal with the issue. Not Dr. Raley. He spent the rest of that afternoon trying to find an available operating room somewhere in the DC metro area that he had privileges at. We received a call from Dr. Raley around 8 pm that evening telling us Susan should meet him at a hospital outside Baltimore. We were able to get Susan there and around 12:30 am that night, Dr. Raley proceeded to operate on Susan and put the pain pump back in her belly and close up her incision. I will NEVER forget that day and night and what Dr. Raley did to fix a potentially dangerous situation . . . When Dr. Raley told me about the

charges he pled guilty to I had trouble believing it.  He cried as he described what he had done and kept apologizing for how it would affect me"

Letter of Bill Pournaras, Exhibit 3.

Dr. Raley's professional colleagues hold him in similar high esteem.  One sole practitioner described Dr. Raley as a "wonderful asset to individuals like me" and "a valuable expert for my patients that are beyond my level of expertise as a general orthopedic surgeon." Letter of David B. Lumsden, M.D., M.S., M.A., Exhibit 4.  Dr. Lumsden described a meeting with a physician new to the area establishing a practice similar to theirs.  Dr. Lumsden wrote:

> "Dr. Raley went out of his way beyond his routine to educate this physician, assist in the development and initiation of an orthopedic solo practice, and offer his guidance and service towards that doctor.  I was always impressed with his selfless perspective, considering that the physician would be an ultimate competitor against his own practice."

*Id.*

Another doctor who has known Dr. Raley for over ten years and has referred patients to him has offered a similar view of Dr. Raley's character:

> "Doctor Raley continues to be a dedicated and hard-working physician.  He has a dedicated patient base traveling many hours in a week to different offices driving a 10-year old car with about 200,000 on the odometer.  Working with his practice for the last three years, I have found him to be dedicated to helping his patients and he works hard to work with his staff and maintain a well run honorable practice.  Although I personally do not do medication pain management, I have always witnessed via multiple office and zoom meetings with the staff that he is completely dedicated to taking good care of the patients and always adhering to the appropriate guidelines to benefit the safety and welfare of the patients."

Letter of R.F. Davis, MD, Exhibit 4.

Another colleague also described Dr. Raley's contributions to the profession, his colleagues and his community when requesting leniency in imposing sentence:

> "Dr. Raley has always put others ahead of himself, particularly as it related to his colleagues and to his patients.  It saddens me to hear that he has pled guilty to healthcare kickbacks and to wire fraud charges, as the Dr. Raley that I have known over the years never struck me as anything other than a selfless physician

> and humanitarian who took excellent care of and truly cared about his patients and his colleagues.  As a practicing physician who is also a U.S. Navy veteran, I have seen many physicians over the years and can say, without reservation, that Dr. Raley is an excellent physician and a humanitarian who cared about others above caring about himself."

Letter of Hasan Abed, MD, Exhibit 4.

Other colleagues expressed the shared view that Dr. Raley is an exceptional physician due to his empathy, ability to listen to his patients' needs, and for his surgical skills.  He is known to truly care about the patients he treats, often taking away from his personal time, and to be a valuable contributor to the medical community.  See Letters, Exhibit 4, and Letters from former employees and community members, Exhibit 5.

### The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law and Provide Just Punishment.

Dr. Raley acknowledges the seriousness of the offense and the need to impose punishment for consequences for his conduct.  However, he has already taken extraordinary steps to make his victims whole, has forfeited all of his gains, and paid an additional civil penalty of over $1.2 million that no other defendant has been required to pay.  As a result, the defendants with whom Raley is jointly and severally liable will not have to pay $444,002.80 of their court ordered restitution, including Abdalla and Myers who received roughly $800,000 in compensation and benefits from LABRX but was required to forfeit only $428,124.99.[10]  Indeed, a majority of the circuits, including the Fourth Circuit recognize extraordinary efforts at restitution as relevant to departure and variance considerations.  See e.g., *United States v. Kim*, 364 F.3d 1235, 1240-41 (11th Cir. 2004), citing *United States v, Hairston*, 96 F.3d 102, 108 (4th Cir. 1996).

---

[10]  *United States v. Myers*, 1:20-cr-00235, Dkt. 25

In addition to the loss of his medical licenses and his sources of income, Dr. Raley has suffered financial consequences not intended or anticipated by the government.  After reaching a financial settlement with the government, Medicare took steps to retroactively recover payments of over $1 million for patients who were treated by providers in Dr. Raley's practice after the date he entered his guilty plea but before he received notice that his billing privileges had been revoked.  Dr. Raley's sentencing was continued by agreement with the government so that he could continue working while he attempted to sell his medical practice.  The actions taken by Medicare forced Dr. Raley to sell the assets of the practice and his urgent care clinics in owner-financed distressed sales that saved the jobs of 50 employees and provided continuity of care for his patients but no guarantee of receiving even a fraction of their value.  The actions taken by Medicare also resulted in the bank, where he had been doing business for 20 years, closing all of his personal and business accounts.

The timing of Dr. Raley's restitution and forfeiture payments in advance of sentencing and his voluntary efforts to reach a settlement with the government show sincere remorse for his conduct and his extraordinary acceptance of responsibility.  Moreover, they not only reflect the seriousness of the offense but also promote respect for the law and provide just punishment.[11]

**The Need to Afford Adequate Deterrence and Protect the Public From Future Crimes of the Defendant**

---

[11] See *United States v. Hickins*, 529 F.3d 1312, 13318-19 (10th Cir. 2008) (a district court "may weigh a defendant's lack of criminal record" in deciding whether to grant a downward variance from the advisory Guidelines range "even when the defendant has been placed into a criminal history category of 1"); *United States v. Smith*, 2008 WL 1816564 *4 (4th Cir. 2008) (affirming downward variance based in part on the defendant's "exemplary life" and lack of a criminal history).

The public does not require future protection from Dr. Raley nor has the government suggested any reason to believe that he will commit crimes in the future.

There is also little evidence to support a finding that imprisonment is always necessary to affect general deterrence.  Available research suggests that the certainty of being caught and punished carries far greater deterrent effect that the severity of the punishment.[12]  In 2009, researchers, Nagin, Cullen and Jonson reviewed evidence on the effect of imprisonment on reoffending that included a sizable number of studies.  The researchers concluded that:

> "… compared to non-custodial sanctions, incarceration has a null or mildly criminogenic impact on future criminal involvement. We caution that this assessment is not sufficiently firm to guide policy, with the exception that it calls into question wild claims that imprisonment has strong specific deterrent effects."[13]

The countless prosecutions the Department of Justice has brought against physicians during the past decade have done nothing to deter defendants still being charged in 2022 with entering into illegal kickback schemes.  Indeed, the government called the Court's attention to 36 defendants that the Department of Justice charged with entering into illegal kickback schemes

---

[12]  See *Five Things About Deterrence*, National Institute of Justice, (June 5, 2016) (NIJ's "Five Things About Deterrence" summarizes a large body of research related to deterrence of crime into five points. Two of the five things relate to the impact of sentencing on deterrence — "Sending an individual convicted of a crime to prison isn't a very effective way to deter crime" and "Increasing the severity of punishment does little to deter crime."), available at https://nij.ojp.gov/topics/articles/five-things-about-deterrence; see also Symposium, U.S.S.C., Federal Sentencing Policy for Economic Crimes and New Technology Offenses, Plenary Session I, "What Social Science Can Contribute to Sentencing Policy for Economic Crimes," at 22 (Oct. 12, 2000) ("One consistent finding in the deterrent literature is that the certainty rather than the severity of punishment seems to be the most effective deterrent."), available at http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/economic-crimes/20001012-symposium/cPlenaryI.pdf.

[13] Nagin, Daniel S., Francis T. Cullen and Cheryl Lero Johnson, "Imprisonment and Reoffending," Crime and Justice: A Review of Research, vol. 38, ed. Michael Tonry, Chicago: University of Chicago Press, 2009: 115-200.

resulting in an estimated $1.2 billion in fraud in July 2022.  In white-collar cases, factors such as marriage, employment, peers, morality, disapproval from loved ones, ostracism, and shame are likely to have a more significant impact on conformity and deterrence than threats of imprisonment.

The need for general deterrence is also less important because Dr. Raley was not convicted for commonly prosecuted schemes involving paying for referrals, or prescribing medically unnecessary testing or medications, working with marketers or fraudulent telemedicine and digital medical technology companies, not using testing in the treatment of patients, prescribing medications or testing without having established a doctor-patient relationship, or billing for products or services that were not provided.  The need for general deterrence is also less important where reimbursement rates were set by the health care programs that significantly exceeded the cost of the ingredients that also increased health care costs to the nation.

### The Need to Avoid Unwarranted Disparities

A sentence of probation with home confinement and community service would not create an unwarranted disparity with the 48-month sentence imposed on Abdalla or the probationary sentence with home confinement imposed on Dr. Rosen.  A probationary sentence with lengthy periods of home confinement and community service would also avoid unwarranted disparities with the variant sentences district courts have imposed in similar cases involving kickbacks throughout the country.

According to the annual statistics published by the United States Sentencing Commission, in Fiscal Year 2021, on average, forty-three percent of all offenders nationally received a sentence within their prescribed guidelines range.  *See* United States Sentencing

Commission Data Analyzer, 2021, Sentence Imposed Relative to Guideline Range Table.[14]
However, the number of defendants that received a "guideline's sentence" fell dramatically when
it came to kickbacks and bribery offenses.  In 2021, only fifteen percent of the individuals
sentenced with a primary offense scored under U.S.S.G § 2B4.1—the guideline applicable to
kickback and bribery offenses—received a sentence within the applicable guidelines range.  *Id*.,
Primary Guideline§ 2B4.1.  In fact, within the § 2B4.1 kickback offenders for 2021, thirty-four
percent of Category I defendants—the same category as Dr. Raley—received a downward
variance that was not the result of a substantial assistance motion filed by the government.  *Id*.,
Primary Guideline § 2B4.1, Sentence Imposed Relative To Guideline Range Table, Category I
Offenders.  Overall, the average sentence length for § 2B4.1 offenders in 2021 was 17 months,
and a median sentence length of 9 months.  *Id*., Primary Guideline § 2B4.1, Average and Median
Sentence Length table.

Moreover, within the larger category of health care fraud offenses for 2021, offenses
where the conduct as stated in the PSR involved the defrauding of a government or private health
care entity, over forty-seven percent of defendants received a variant sentence.  *See* United States
Sentencing Commission Data, Quick Facts—Health Care Fraud Offenses, Fiscal Year 2021.[15]

In addition to the sentencing guidelines, the need to avoid unwarranted sentence disparities
among similarly situated defendants is an important and statutorily mandated factor that any
sentencing court must consider in arriving at an appropriate sentence.  See 18 U.S.C. § 3553(a)(6).
In that regard, sentences imposed in unrelated health care fraud cases involving kickbacks support

---

[14] Available at: https://ida.ussc.gov.

[15] Available at: https://www.ussc.gov/research/quick-facts/health-care-fraud

the imposition of a sentence that is significantly below the advisory guideline range and the below

the 48-month sentence recommended by the government:

- *United States v. Baldizzi,* Case No. 8:16-cr-00271 (M.D. Fl): Doctor pled guilty to one count of conspiracy to commit healthcare fraud and one count of solicitation or receipt of health care kickback, in connection with kickback payments he received from sales representatives in exchange for his prescriptions for compound scar, pain, and migraine creams to be filled at specific pharmacies.  The conspiracy *billed health insurers, including Tricare, more than $12.4 million* for compounded cream prescriptions written by the defendant.  Baldizzi was *sentenced to twelve months and one day* imprisonment, *ordered to pay $6,404,793.24 in restitution*, and had to forfeit $100,000.

- *United States v. Ogon*, Case No. 2:19-cr-00687 (D. NJ): Doctor pled guilty to one count of conspiracy to commit health care fraud.  Defendant admitted signing prescriptions for compounded medications without having established a doctor-patient relationship, speaking with the patient, or conducting any medical evaluation.  Defendant signed preprinted prescription forms with patient information and medication already filled out and steered prescriptions to specific compounding pharmacies involved in the conspiracy. Doctor received $20 to $30 for each prescription.  The conspiracy caused *losses to health care benefit programs of over $24 million*, including losses to government health care programs of over $7 million.  Defendant was *sentenced to thirty-three months* in prison, *ordered to pay restitution in the amount of $24.3 million*, and had to forfeit $75,000.

- *United States v. Campo*, Case No. 2:20-cr-00129 (E.D. La): Licensed pharmacist pled guilty to conspiracy to commit health care fraud and money laundering.  Campo worked with his co-conspirators to market compounded medications produced by Prime Pharmacy where Campo was the pharmacist in charge.  Conspirators worked with marketers outside of the state to find patients willing to receive medically unnecessary compounds and doctors willing to prescribe compounds without medical necessity.  Campo and his co-conspirators selected formulas for compounded medications to maximize reimbursement from Tricare.  In total, the conspiracy caused Tricare, and other health care benefits programs, to reimburse Prime Pharmacy approximately *$16 million* for High-Yield Compounded Medications.  Campo was *sentenced to twenty-eight months imprisonment*, and *restitution of $3,015,579.17*.  The pharmacy's office manager and IT director, were each *sentenced to three years of probation* and *restitution of $180,000.00 and $777,749.20* respectively.

- *United States v. Dr. N Vahedi Pharmacy Inc. et al.*, Case No. 2:19-cr-00531 (C.D. Cal): Licensed pharmacist, and his compounding pharmacy, Fusion Rx, plex guilty to conspiracy to commit health care fraud and payment of illegal kickbacks.  Vahedi and Fusion Rx routed millions of dollars in kickback payments through the businesses of two marketers to steer prescriptions for medically unnecessary compounded drugs to Fusion Rx.  Vahedi and the two marketers provided physicians with preprinted prescription pads with agreed-upon formulations to maximize the amount of insurance reimbursement for

the compounded drugs. To encourage patients to continue seeking the compounded drugs, Fusion Rx failed to charge copayments to patients.  Fusion Rx received approximately *$14 million in reimbursements* *on its claims for compounded drug prescriptions* from health care benefit programs, including over $5 million from federally funded health care programs.  Vahedi was *sentenced to 30 months imprisonment* and *restitution in the amount of $4,400,525.16.*  The two *marketers involved in the scheme* received respective *sentences of three years of probation and six months imprisonment*.

- *United States v. Boyd*, Case No. No 4:19-cr-00119 (N.D. Okla) & *United States v. Woodson*, Case No. 4:19-cr-00128 (N.D. Okla): Owners of marketing firm, R&A Marketing, pled guilty to conspiracy to pay kickbacks. R&A recruited physicians to steer prescriptions to a compounding pharmacy that was controlled and operated by two other members of the conspiracy in exchange for illegal kickbacks. In return, the physicians wrote expensive prescriptions for compounded drugs and delivered those prescriptions to the conspirators' pharmacy.  The physicians were provided with pre-printed prescription pads that listed compounded formulas that the physicians selected. Boyd agreed that the government suffered a *loss of $1,411,440.19* and was *sentenced to twelve months of probation* and *ordered to pay $391,475.41 in restitution*.  Woodson agreed that the government suffered a *loss of $2,002,771.85* and was *sentenced to twelve months of probation* and ordered to *pay $553,232.45 in restitution*.

- *United States v. Sabado*, Case No. 1:21-cr-00226 (N.D. Ga): Operator of pharmaceutical company NHS, pled guilty to conspiracy to commit health care fraud.  Compounding pharmacies paid NHS a portion of Tricare reimbursements, and NHS paid a portion of its proceeds to healthcare marketing companies that recruited providers to prescribe unnecessary compound medications.  The fraudulent compounded medication scheme caused a *loss of $4.5 million to Tricare*.  Operator of pharmaceutical company also conspired with the owners of durable medical equipment ("DME") supply companies to submit fraudulent claims for medically unnecessary DME.  The defendant shipped thousands of fraudulent DME orders to Medicare beneficiaries knowing that the DME orders were based on sham prescriptions written by telemedicine physicians who never spoke with or examined the Medicare beneficiaries for whom the physicians ordered DME. The fraudulent DME scheme caused a *loss of almost $70 million* to Medicare. Defendant was **sentenced to** *five years imprisonment* and *agreed to pay $950,000 as part of a civil settlement* to resolve violations of the False Claims Act.

Moreover, in guarding against unwarranted sentencing disparaties, the Court should

consider similar cases where the government has declined to bring criminal prosecutions, opting

instead to pursue a civil remedy under the False Claims Act:

- *United States ex rel. Thornton v. National Compounding Co., et al.*, Case No. 8:15-cv-2647 (M.D. Fla. 2015): Former owners of a telemarking company agreed to **pay at least $4 million** to resolve, by way of a civil settlement, the government's claims that they

violated the False Claims Act by engaging in a scheme to work with pharmacies to identify compounded drug formulas that maximized reimbursement, regardless of the medical need for the chosen formula, and then pay telemedicine providers to prescribed these compounded drugs, despite the providers having to see the patients for whom they were prescribed.

- *United States ex rel. Sanchez v. Smart Pharmacy, Inc., et al.,* Case No. 14-cv-1453 (M.D. Fla) & *United States ex rel. Kohli v. Smart Pharmacy, Inc., et al.*, Case No. 16-cv-387 (M.D. Fla): Civil complaint alleges two compounding pharmacies routinely waived patient copayment obligations and improperly added large quantities of expensive drugs to their compounded pain cream formulas to boost reimbursements for the prescriptions. Complaint alleges that the scheme resulted in "millions of dollars of loss to federal health care programs."

Nearly all of these cases involved prescriptions for compounded medications that were medically unnecessary, involved sham prescriptions, or were prescriptions written by doctors without having established a doctor-patient relationship, speaking with the patient, or conducting any medical evaluation.  Most of the cases also involved fraudulent claims that the parties agreed resulted in losses far exceeding the $3.9 million that Fallston Pharmacy and Abdalla billed the health care programs for Dr. Raley's pain cream prescriptions.  The actual losses to health care programs also substantially exceeded the $444,002,80 that Dr. Raley paid in restitution in all but two cases.  These cases resulted in sentences substantially lower than the 48 months recommended by the government in all but one case.

Imposition of a 48-month sentence would create significant disparities between the sentences this Court imposed on both Mohamed Abdalla and the other pharmacy defendants and on Dr. Rosen.

As the government argued in a previous filing, Abdalla was the mastermind behind a massive scheme to defraud health care benefit programs.  Only one of his schemes involved Dr. Raley.  Abdulla and his co-conspirators billed for prescriptions that not only were unnecessary in some schemes but also billed insurance companies for medications that had never been

prescribed or authorized, including prescriptions not prescribed or authorized by Dr. Raley.[16]

The government further argued that "Abdalla's fraudulent conduct was so extensive that the

probation office calculated the loss attributable to him to be in excess of $19,000,000," five times

the $3.9 million loss attributed to Dr. Raley.[17]  Abdalla was ordered to pay restitution in the

amount of $7,920.796.78, almost 18 times the actual loss for which Dr. Raley was held

accountable.[18]  Unlike Dr. Raley, Abdalla is believed to have made minimal payments towards

his restitution and forfeiture obligations.

Dr. Raley did not engage in conduct or occupy a position of trust that would justify a

higher sentence than Abdalla.  To the contrary, Dr. Raley never violated the trust of his patients

and held no higher position of trust with respect to the insurers than the pharmacists who filed

the false claims.  Dr. Raley's personal history and characteristics, and his markedly less culpable

offense conduct warrant a sentence well below the 48-month sentence this Court imposed on

Abdalla.

Nor would a sentence of probation with periods of lengthy home confinement and

community service create an unwarranted disparity with other sentences imposed for similar

kickback schemes or with the probationary sentence imposed on Dr. Rosen.

Unlike Dr. Raley, Dr. Rosen abused the position of trust he held with respect to his

patients by prescribing medications that were not medically necessary, instructing Nurse

Practitioner 1 to sign blank pages of a prescription pad, and by signing letters to a pharmacy

benefit manager that he did not read or write, confirming that his practice wrote prescriptions

---

[16]  See Government Position on Sentencing, *United State v. Leonard Rosen*, No. 1:21-cr-00205, Dkt. 18, p. 20.

[17] *Id.*

[18] Judgment, *United States v. Mohamed Abdalla*, No. 1:10-cr-00250, Dkt. 20.

Abdalla filled for a compound he knew nothing about.  Health care benefit programs paid $2,212,442 for compounded prescriptions that were prescribed by Dr. Rosen and Nurse Practitioner 1 for which he did not assess the medical necessity.  Dr. Rosen also engaged in a separate fraudulent scheme, that included setting up a company to bill as an out-of-network provider for prescriptions and services he provided to his in-network patients and provided advice to another doctor regarding how to set up such an entity.[19]  As a result of that scheme, health benefit programs paid $205,095.

Like Dr. Rosen, Dr. Raley has no criminal history.  His personal history, long record of service to his patients and his substantial contributions to the medical community warrant a substantial variant sentence.  In addition, the $3.1 million Dr. Raley voluntarily paid his restitution and forfeiture obligations and to settle civil penalties no other defendant was required to pay, as well as Medicare's actions to retroactively recoup over $1 million in patient payments, warrant a similar sentence as the one imposed on Dr. Rosen.

## CONCLUSION

For the foregoing reasons and any other reason that may appear to the Court, Dr. Raley requests this Court sentence him to a term of probation with lengthy periods of home confinement and community service.

Respectfully Submitted,

THOMAS RALEY, JR.,
By Counsel
_____/s/_____
Nina J. Ginsberg, VSB # 19472
1101 King Street, Suite 610
Alexandria, VA 22314
(703) 684-4333 (T)
nginsberg@dimuro.com

---

[19] Statement of Facts, *United States v. Leonard Rosen*, No. 1:21-cr-00205, Dkt. 7, pp.5-7.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 15th day of November 2022, I filed the foregoing pleading through the ECF system, which shall then send an electronic copy of this pleading to all parties in this action.  I also certify that on the aforementioned date I forwarded a copy Kelly Smihal, U.S. Probation Officer, via e-mail at <u>Kelly_Smihal@vaep.cuscourts.gov</u>.

_____/s/_____

Nina J. Ginsberg, Esq.